## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JUSTIN URBAN,<br><br>Plaintiff,<br><br>v.<br><br>ZURICH AMERICAN INSURANCE COMPANY,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)  Civil Action No. 21-CV-11182-AK<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## FINDINGS OF FACT, RULINGS OF LAW, AND
## ORDER FOR JUDGMENT

**ANGEL KELLEY, D.J.**

In this action, Plaintiff Justin Urban brings M.G.L. c. 93A and 176D claims against Defendant Zurich American Insurance Company ("Zurich") for failing to tender a reasonable settlement offer once liability became reasonably clear.  On June 17, 2024 the Court presided over a five-day bench trial.  Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court sets forth the following findings of fact and conclusions of law.

This insurance matter arises from an auto accident in a busy intersection in Billerica, Massachusetts.  On the morning of September 12, 2014, the traffic was heavy and slow moving, near and through the intersection of Route 3A (otherwise known as "Boston Road") and Treble Cove Road.  The insured, Keith Weston, was driving his employer's van northbound as he entered said intersection, while Plaintiff Justin Urban was riding his motorcycle southbound into the intersection.  The collision of the insured's van and the motorcycle occurred in the intersection of Boston Road and Treble Cove Road.  Urban sustained extensive and serious

1

medical injuries, including fractures in his pelvis, left hip, left fibula, left tibia, left femur, left ankle, left shoulder, left humerus, and left ulna.  He also sustained injuries to various organs, joints, and muscles.  Urban underwent multiple surgeries and medical procedures, and was hospitalized for a total of 26 days, resulting in $318,639.29 in medical bills.

The issue before the Court is whether Zurich acted reasonably and in accordance with M.G.L. c. 93A and Chapter 176D in handling Urban's claim.  During the five-day trial, this Court evaluated what evidence was, or should have been, available to Zurich to determine if, and when, liability became reasonably clear in the underlying auto accident.  The Court also evaluated whether Zurich satisfied its obligation to carry out a reasonable investigation to determine liability.  Zurich made three offers in the course of negotiation in the underlying matter and one offer following a verdict in Urban's favor in that case.  The Court must determine whether liability was reasonably clear and then assess whether Zurich's settlement offers were reasonable.  If Zurich failed to make a reasonable offer, then the Court must evaluate whether Zurich's actions warrant punitive damages based upon "wilful" or knowing actions.

Following the five-day trial, the Court makes the following findings of facts and conclusions of law.

## I.      FINDINGS OF FACT[1]

### A.  Parties

1.    Plaintiff is a resident of the Commonwealth of Massachusetts.

2.    Defendant Zurich is a company with a principal place of business in Schaumburg, Illinois.

3.    At all relevant times, Keith Weston was an employee for Interstate Electrical Services Corporation ("Interstate").

---

[1] Citations to the record are provided for paragraphs that contain disputed facts.

4.  At the time of the accident, Weston was operating his work van within the scope of his employment with Interstate and was covered under Zurich's insurance policy.

5.  At all relevant times, Interstate and Weston were insured by a commercial automobile policy issued by Zurich.

### B.  The September 12, 2014 Collision

6.  On Friday, September 12, 2014 at 7:04 A.M., Justin Urban was riding his motorcycle southbound on Boston Road (Rt. 3A) in the left lane when he entered the intersection of Boston Road and Treble Cove Road.  At this time of the morning, there were heavy traffic conditions requiring vehicles to travel slower than the speed limit.

7.  Urban entered the intersection within the speed limit, estimated to be around 30 miles per hour.  However, he was operating his motorcycle faster than what was appropriate for the gridlocked morning traffic.

8.  Weston was traveling northbound when he entered the intersection of Boston Road and Treble Cove Road.  Weston had pulled out into the middle of the intersection and was waiting to make a left hand turn with the green light.

9.  There was a pickup truck in the left southbound lane (the lane that Urban was traveling in) that had taken a left turn roughly 10 seconds prior to Urban entering the intersection.    At that time, Weston did not see Urban.

10.  At some point prior to attempting a left turn, Weston was looking in the direction of the opposite, southbound traffic and observed Marie Richards wave or gesture with her hand at Weston to indicate he had permission to make the left turn in front of her.

11.  After the pickup truck made its left turn, as Weston's vehicle was in motion to take his left turn, he failed to see Urban riding his motorcycle through the intersection and struck Urban as Weston was making his left turn.

12.  The front left corner of the drivers' side of the van struck Urban's motorcycle in the left, southbound lane.

13.  The Billerica police responded to the accident scene.  As a former, longtime Billerica police officer, Weston personally knew some of the responding officers, including the traffic enforcement officer and the officer taking the photos of the scene.  The Billerica police investigated the accident.

### C.  Zurich's Initial Investigation of the Claim

14.  After Zurich was notified of the accident, it assigned the claim to Charles Murray, a Major Case Unit ("MCU") Specialist for Zurich, on or near September 18, 2014.  Murray is an experienced claims professional and has worked in the insurance industry since 1984.

15.  On September 18, 2014, Murray retained Todd Butler of George Butler Adjusters Inc. to investigate the speed of the motorcycle leading up to the incident and whether there were any "visual obstructions" that may have impacted Weston's vision before striking Urban's motorcycle.

16.  On September 24, 2014, Attorney Richard McLaughlin, Urban's then-counsel, sent a letter to Butler requesting the amount of the insured's liability coverage pursuant to M.G.L. c. 175, Section 112C.[2]

17.  On September 30, 2014, Butler responded to McLaughlin's letter, indicating Zurich's policy limit for Interstate was $1,000,000 per occurrence.

18.  On October 31, 2014, Butler submitted his Preliminary Report to Murray and Zurich (hereinafter referred to as the "Butler Report").  His investigation consisted of interviewing witnesses, reviewing police reports, accompanying documents, and obtaining background information on Weston and Urban.

19.  On December 16, 2014, Murray reported to Interstate that he wanted to retain counsel as soon as possible "to get an accident reconstruction expert on board."  [Exh. 57 at ZUR0375].

20.  Two days later, on December 18, 2014, Murray emailed Todd MacDermott, Interstate's insurance broker, and representatives of Interstate.  In this email, Murray indicated his intention to refer the defense of Interstate and Weston to Attorney Scott Carroll of Boyle Shaughnessy P.C., Interstate's preferred defense counsel, and reiterated his plans to retain an accident reconstruction expert.  Carroll was retained to represent the interests of Interstate and Weston.

21.  Carroll is an experienced trial attorney who has defended Zurich's insureds for over twenty years.  Throughout his career, Carroll has worked between 15 and 20 cases with Murray.

**D.  Urban's 93A Demand**

22.  On November 29, 2016, Urban's attorney made a demand for $1.5 million but was willing to "execute a release in [the] insured's favor in the amount of [its] 1M policy limit and would not make any attempt to pursue [the company's] assets."  The demand package included doctors' reports, medical bills, a lost wage form from Urban's employer, a collision analysis report from former Massachusetts State Police Lieutenant Kerry Alvino,

---

[2] Butler provided this letter to Murray, who confirmed that Butler could provide Zurich's liability limits.  [See id. at ZUR0188].  Butler wrote to Murray (attaching Attorney McLaughlin's September 24, 2014 letter) stating, "In the letter, please note that he is requesting the policy limits.  We are preparing a letter to Atty McLaughlin. if [sic] you would like for us to incorporate the limits for the policy into this letter, please confirm the applicable liability limits. Alternatively, if you wish to provide these to Attorney McLaughlin, please cc us a copy of any letter you send him." [Exh. 2 at ZUR0188].  Attorney McLaughlin and Butler provided Zurich's policy limit, however, failed to disclose the excess insurance limit until days before the underlying trial.  Urban argues that this failure reflected intentional or bad faith conduct. There is insufficient evidence to establish that Zurich acted intentionally or in bad faith. Accordingly, the Court declines to further address this argument.

photographs of the accident location, and photographs of Urban.  Retained as a collision reconstructionist specialist.

23. On February 23, 2017, Zurich countered with a $100,000 offer, which Urban declined.

24. On March 16, 2017, Urban declared his intent to file a lawsuit against Interstate, prompting Murray to request mediation.  The first mediation took place in July of 2017.

### E. Assessment of Liability and Information Available to the Parties

At trial, Murray testified Zurich had an obligation to tender a settlement offer when liability became "reasonably clear."  In evaluating whether liability was reasonably clear, Zurich identified four critical factors that influenced its liability determination: (1) whether Weston's van was moving at the time of impact; (2) where the impact occurred within in the intersection; (3) whether Urban was weaving in and out of lanes or creating his own lane prior to entering the intersection; and (4) determining Urban's speed riding through the intersection.  The Court reviewed the evidence available, and considered what evidence should have been available to Zurich regarding these four factors to determine if, and when, liability was reasonably clear.

### i. Whether Weston's Van Was Moving

25. Carroll reported to Murray that "[i]t will be critical to determine if Weston's vehicle was moving at the time of the accident in order to properly assess liability in this matter.  If [Weston] was moving at the time of the accident, he would likely be found at fault as he was making a left hand turn across two lanes of heavy traffic.  In order to fully investigate this issue, we would recommend retaining an accident reconstructionist . . . .  We believe that a reconstructionist will be able to assist us in examining the damaged van to determine whether objective evidence exists to support our position that Weston's vehicle was stopped at the time of impact."  [Exh. 11 at ZUR0549].

26. Carroll further concluded that if Weston was not moving at the time of the impact, Urban had "no case."

27. Similarly, Murray believed the critical fact determining liability was whether Weston was moving at the time of the collision.

28. On September 12, 2014, Weston provided an unsworn, written statement indicating that he was driving north on Boston Road at the intersection Boston Road and Treble Cove Road.  Weston put his "directional light on to make a left turn," then made a partial turn and

stopped.  While stopped, he observed a pickup truck in front of him, heading southbound on Boston Road, in the opposite direction, and then turning left onto Treble Cove Road. After the truck passed, a woman facing southbound on Boston Road allowed Weston to make a left turn onto Treble Cove Road, but "[b]efore [he] could make the turn, a motorcycle appeared suddenly and hit the left front portion of [Weston's] vehicle."  [Exh. 30 at ZUR0275].

29.   Zurich was aware as early as September 29, 2014, just two weeks after the accident, that Richards' account of the collision included Weston moving at the time of impact.  [TTIII at 215:4-9; Exh. 3 at ZUR0463].

30.   In Richards' recorded statement taken on September 29, 2014, she stated that Weston "started to make [a] turn" after she waved him through and that the van was moving when the van and motorcycle collided.  [Exh. 3 at ZUR0460, 0462].  Specifically, she described Weston as "moving, he was taking his turn, he was going very slow . . . 5, 10 miles an hour at the most."  [Id. at ZUR0463].

31.   Butler's October 31, 2014 report stated that during Weston's interview, he claimed he was "stopped" in the intersection of Boston Road and Treble Cove Road in the center lane in heavy traffic.  Weston thought he may have "edged slightly . . . in a minor fashion" as he prepared to turn left down Treble Cove Road.  After being waved through by Richards, he believed that his vehicle did not move at all, and if it did, it was "very minor" [Exh. 4 at ZUR0269-0270].

32.   On March 24, 2015, Urban provided a written statement indicating he was operating his vehicle southbound on Boston Road.  As he approached the intersection of Boston Road and Treble Cove Road, he noticed a white van approaching to make a left-hand turn.  He slowed his motorcycle to ensure the van would stop.  The van came to a complete stop, and as Urban proceeded through the intersection with the green light, the van "suddenly" started to move forward and turn.  Urban "did not have any time to react" and his motorcycle "struck the driver-side front corner of the van and [he] was thrown from the motorcycle."  [Exh. 9 at ZUR0532].

33.   On April 9, 2015, Carroll reported to Murray following his meeting with Weston.  [Exh. 10].  During the meeting, Weston maintained he "was stopped" when the motorcycle suddenly crashed into him.  Weston also "confirmed that the motorcycle was passing between the two lanes of heavy traffic immediately before the accident."  [Id. at ZUR0535].  Weston "adamantly denied that he was moving his vehicle at the time of the accident."  [Id.].

34.   In Carroll's May 2015 update to Murray, he noted that Weston's account conflicted with Richards' account, which indicated that Weston was moving at the time of impact.  [Exh. 11 at ZUR0548].

35.   On July 22, 2015, Alec Johnston provided an unsworn, written statement detailing that on the day of the accident, around 7 A.M., after hearing a loud noise from a motorcycle, he

looked out of the windows of his house and saw a white van stopped in the left northbound lane of Treble Cove Road.  He observed the motorcycle "swerve from the southbound lanes into northbound [sic] left lane and strike the van which was stopped at this time."  [Exh. 35 at ZUR0570].

36.    Included in Urban's 2016 demand package to Zurich was the collision analysis report by their accident reconstructionist, Alvino, dated September 12, 2014.  The report concluded that:

    a.    Weston was stopped in the left lane traveling northbound on Boston Road, in anticipation of making a left turn onto Treble Cove Road;

    b.    A pickup truck heading southbound executed a left turn in front of Weston's vehicle. Urban was traveling behind the truck going southbound;

    c.    Urban approached Weston's stopped van in the intersection going straight, when Weston "unexpectedly" made a left turning into the southbound lane that Urban was traveling in, and "encroached upon [Urban's] right-of-way." Weston was likely "reacting" to Richards, who was stopped on the other side of the intersection heading southbound in the right lane, waiving Weston through the intersection;

    d.    Weston "failed to check for oncoming traffic" in the left southbound travel lane behind the pickup truck that had not turned;

    e.    The van was traveling 5-10 mph when it struck Urban.

[Exh. 58 at URBAN2844-2845].

37.    At Urban's deposition dated April 6, 2018, Urban testified that Weston was stopped in the middle of the intersection without his "directional" or "turn signal" on.  [Exh. 39 at 52:17-19, 98:2-99:20].  Urban stated that Weston suddenly pulled forward as Urban entered the intersection, and Weston turned more than halfway into Urban's lane and "pulled into" Urban, hitting him on the side with the driver's side of the van.  [Id. at 53:4-11, 61:24-62:3, 69:10-12].  Urban added that when the van struck Urban, it had accelerated from its stopped position.  [Id. at 55:19-56:5].

38.    Carroll's May 11, 2018 report to Murray summarized Urban's and Weston's depositions. [Exh. 18 at ZUR1425-1432].  As to Weston's testimony, Carroll emphasized that Weston was adamant he did not move the van prior to the collision, and that Richards waved him through the intersection.  [Id. at ZUR1431].

39.    During Richards' May 22, 2018 deposition, she testified to the following:

    a.    The van was moving and had begun making the turn prior to the impact [Ex. 19 at 45:1-4, 115:5-9; TTIII at 213:14-16];

b.  At the time of impact between the van and the motorcycle, the van's movement "wasn't like [the] beginning crawl of a turn" but was already accelerating." [TTIII at 215:13-18 (quoting Exh. 19 at 47:6-11)]; and

c.  Richards stated she would "never forget" "how [the van] hit the motorcy[cle]." [Exh. 19 at 87:18-24].

40.  Carroll's June 18, 2018 report to Murray summarized Richards' deposition.  He noted that Richards maintained Weston was halfway into his turn at the time of impact, and mentioned that "unfortunately, Mrs. Richards occasionally would describe the accident as the van hitting the motorcycle . . . ." [Exh. 20 at 1435-7; Dkt. 128-1 at ¶ 9].

41.  Carroll's August 21, 2018 pre-mediation report for Murray and Zurich indicated that there was conflicting testimony as to whether Weston was in motion at the time of the collision. The report cites to Weston's testimony and Johnston's statement for support that Weston's van was stopped at the time of impact, but notes that Richards' testimony was consistent that Weston was moving.  The report then states this is "an important fact but since it is disputed, it will be determined by the credibility of witnesses."  [Exh. 21 at ZUR1451].

42.  By the close of discovery, Zurich was unsuccessful in obtaining Johnston's deposition. Accordingly, there was no other testimony supporting Weston's contention that he was not moving at the time of the collision.

**ii.  Where the Impact Took Place**

43.  Throughout the course of litigation, Murray believed an accident reconstructionist was necessary to review photos of the accident scene and evaluate physical evidence to determine the location of collision.  [TTI at 113:24-114:13].

44.  Zurich had access to the photographs of the van's damage, provided by the Billerica police, which were included in Butler's October 2014 report.

45.  Butler's October 31, 2014 report stated that, Weston claimed that he was preparing to make a left-hand turn, when the motorcycle struck his vehicle.

46.  According to Carroll's initial March 17, 2015 report sent to Murray, Richards stated that the collision occurred "pretty much head-on" just as Weston began his turn, emphasizing that the impact happened as Weston began his turn.  [Exh. 34 at ZUR0486-0487].

47.  On May 20, 2015, Carroll wrote that an unidentified person called 911 to report that a motorcycle was struck by another vehicle.  [Exh. 11 at ZUR0548].

48.  At his deposition on April 6, 2018, Urban testified that he saw the van move towards him and tried to avoid being hit by veering to the right "a little."  [Exh. 39 at 70:13-71:6].

49.  Weston testified at his April 12, 2018 deposition that once he pulled into the intersection, he made a partial turn while remaining in his lane, but also stated that he was completely stopped, waiting for the truck going southbound to complete the left turn.  [Exh. 40 at 54; 86-87].  He later testified in his deposition that he had already made the turn, then stopped, and then made a partial turn.  [Exh. 40 138:15-22; 140:10-12].

50.  Weston also testified that Urban did not cross the double lines into Weston's northerly lane to hit Weston straight on.  It was later clarified that there were no actual yellow lanes in the intersection; however, Weston was speaking hypothetically, indicating he was on his side of the road when the collision happened.  Weston also stated that Urban was "closer to the right [southbound] lane than the left edge of the left lane" when he saw Urban.  [Exh. 40 at 100:5-18; 139:9-10, 140:1-141:10].

51.  Weston stated at his deposition that after the collision occurred, he moved his van "left sideways" 5 to 10 feet to block Urban's body from traffic and protect him from being struck by other vehicles.  For this reason, Weston concluded that the position of the van in the photographs of the accident was not the position the van was in at the time of the collision.

52.  During Richards' May 2018 deposition she testified to the following:

   a.  The van was halfway into the left-hand turn at the time of impact [Exh. 19 at 45:5-7];

   b.  If the double yellow line had continued into the intersection, (which it hadn't) the van would have crossed over those double lines into the southbound lane prior to the impact.  [Exh. 19 at 46:16-22; TTIII at 214:11-15].

53.  Murray assessed that the accident "barely" occurred in the left southbound lane and that Weston was "creeping out in anticipation of taking the left-hand turn."  In other words, it was his assessment that the collision "barely" occurred on Urban's side of the road.  [TTI at 120:3-7].

54.  Murray made his assessment of where the impact took place in the intersection based on physical evidence, photographs of the accident, and other evidence.  However, neither Murray's assessment of the impact location nor the photographs of the accident were ever included in any of Zurich's reports or Murray's correspondence with Zurich assessing liability.

55.  Murray further testified at trial that he did not include in his reports to Zurich any discussion of the photos displaying the physical evidence of the accident or his evaluation that the impact occurred in Urban's southbound lane, because he felt they were "inconclusive."  [TTI at 129:17-130:1].

56.  Zurich never obtained an accident reconstructionist to review the photographs or the physical evidence.

57. Based on evidence available to the parties regarding whether Weston was moving and the location of the impact, the Court finds that by July of 2018, there was sufficient evidence to indicate Weston's van was moving at the time of impact and that Weston's van hit Urban's motorcycle in Urban's lane of travel.

### iii. Urban's Conduct Leading Up to Entering the Intersection

58. Zurich's evaluation of liability focused on evidence of Urban's negligent actions leading up to the accident.

59. Weston told the police that Urban was weaving between cars before reaching the intersection.  [Exh. 73 at ZUR0141; see also Exhs. 5, 7, 16, 17, and 21; TI at 124:13-125:3].

60. Richards' recorded statement taken on September 29, 2014, stated that she did not see Urban until he rode past her window.  [Exh. 3 at ZUR0460, 0461].  She didn't recall what lane he was in prior to that point.  [Id. at ZUR0461].  However, she concluded that Urban "must have come up between the cars and then that lane was empty, so he's scooted around me" and entered the intersection.  [Id. at ZUR0462].  Richards also confirmed a second time in that same interview that she did not see Urban before he passed her.  [Id. at ZUR0462].

61. The Butler Report stated that "Ms. Richards opined that the motorcyclist must have been weaving in and out of traffic just based on the fact of how erratically he was driving but again she noted that was speculation on her part."  [Exh. 4 at ZUR0271].

62. Butler's Report also contained the following:

    a. The preliminary finding by the Billerica police "suggested the accident was caused by the operation of the motorcycle by Mr. Urban." [Exh. 4 at ZUR0268];

    b. Weston believed the motorcycle "came up in between the vehicles and the lanes" prior to "impacting the vehicle." [Exh. 4 at ZUR0270]; and

    c. During the initial interview between Butler and Richards, Butler "received the sense that, in [Richards'] opinion, the primary person responsible for the accident was Mr. Urban."  During her in-person interview on September 29, 2014, she indicated that traffic was heavy, however, she had a clear and unobstructed view of the accident and was located across the intersection from Weston.  [Exh. 4 at ZUR270].

63. Murray considered the idea that Urban was "weaving through, tooling the traffic in the southbound lane" as a significant factor in determining the likelihood of winning.  [TTI at 123:10-124:25; 124:13-25].  Murray cited to the September 29, 2014 police report as the source of this information.  [TTI at 124:17-25].  Butler also reported the weaving. Ultimately, the source of this characterization came from Weston.  [TTI at 124:21-125:3].

64. Carroll reported, after interviewing Weston in March of 2015, that Weston claimed that because Urban was on a "'sport bike' . . . it would have been difficult for [Urban] to look up and around the stalled traffic in front of him as he passed between vehicles, likely contributing to his inability to avoid the accident."  [Exh. 10 at ZUR0535].

65. On February 17, 2015, Carroll included the following in his initial lawsuit report to Murray:

> "[A]ccording to the official police report . . . [Urban] drove his motorcycle at a high rate of speed between the two south bound [sic] vehicles on Route 3A . . . . The responding officer's report suggests . . . (and depicts in a diagram) that the plaintiff's motorcycle traveled around the turning rear portion of the southbound vehicle, passing between it and Richard's [sic] vehicle just prior to striking Weston's vehicle . . . ."

[Exh. 34 at ZUR0486-0487].

66. Murray's August 1, 2017 MCU report to Zurich states that Urban "veered at a high rate of speed between two southbound vehicles."  [Exh. 17 at ZUR1360].

67. Weston testified during his April 12, 2018 deposition that while sitting at the traffic light of the intersection where the collision occurred, he recalled the left (southbound) lane being empty for up to ten seconds.

68. As to where Weston was looking and what he saw prior to the collision, he testified that he:

   a. Did not see Urban's motorcycle coming up the lane, and the first time he saw Urban's motorcycle was "a second before he hit me" in the intersection; [Exh. 40 at 97:5-22];

   b. Roughly 10 seconds prior to the impact, Weston saw the pickup truck heading southbound turn left, and Richards waved him through the intersection; [Id. at 56:3-6, 57:19 – 58:23, 95:20-97:4];

   c. Once Richards provided Weston the "go ahead" wave, Weston was looking at her and claimed that he "would be able to see peripherally off to the side," [Id. at 173:4-20];

   d. Weston couldn't make the left turn right when Richards waved him through because he was waiting for the southbound truck to finish turning [Id. at 56:11-58:10; 5] once he looked back to his left, the way that he was turning, "there was a motorcycle."  [Id. at 173:19-20].

69. Carroll's May 11, 2018 report to Murray provided a summary of Urban and Weston's depositions.  [Exh. 18 at ZUR1425-1432].  As to Weston's summary, Carroll included that Weston only saw Urban a "split second" before the collision.  [Id. at ZUR1431].

70. There were several contradictions of material facts in Weston's own account of the accident in his deposition testimony as to where he was looking and what he saw leading up to the collision. He did not provide a clear account to conclude where exactly he was looking prior to the collision. His testimony confirms that he did not see the manner of Urban's riding leading up to the collision and he did not see Urban until the collision occurred.[3] Weston confirmed he did not see Urban's motorcycle coming up Boston Road and the first time he saw the motorcycle was "but a second before [Urban] hit me." [Exh. 40 at 97:5-11].

71. During her May 2018 deposition, Richards testified that she did not see Urban's actions before he passed her and she assumed that Urban weaved in between cars. [Exh. 19 at 110:23-111:7, 157:1-9; 144:14-24].

72. By the close of discovery, no evidence supported the fiction that Urban was weaving in between vehicles or creating his own lane on his way to the intersection.

73. Notwithstanding the lack of evidence supporting the theory that Urban was weaving in between vehicles or creating his own lane, Murray continued to include Weston's fictionalized fact in his liability assessment reports and pre-mediation reports leading up to trial.

74. For example, in Murray's 2018 pre-mediation report, under the liability analysis, the report states "the plaintiff entered the intersection at a high rate of speed for the traffic conditions, between stopped motor vehicles, and therefore we believe a jury will find that the plaintiff was, at least, 50% at fault for the accident." [Exh. 21 at ZUR1455]. Additionally, under the legal defenses section it states that "Urban imprporly [sic] shifted lanes just prior to entering the intersection . . . ." [Exh. 21 at ZUR1451].

75. Ultimately, Murray testified at trial that there was no evidence to support that Urban improperly shifted lanes prior to entering the intersection. [TTII at 124:20-125:17].

### iv. Urban's Speed in the Intersection

76. Murray believed that Urban's speed traveling into the intersection when the collision occurred was the most important factor in assessing liability, in addition to other factors such as the location of the impact and whether Weston was moving at the time of impact.

---

[3] In his deposition, Weston testified that if he were looking at [Richards' car], he would have been able to see "anything" that was coming up the road (southbound). [Exh. 40 at 172]. He also stated that he wasn't looking "way down the road" before he turned, but "at the lady" and the left lane heading southbound where the truck was turning. [Exh. 40 at 60:13-18]. He also states that he wasn't looking at anyone coming down the left lane (the left lane Urban would have come down), southbound because he was "looking at this lady." [Exh. 40 at 70:24-71:1]. Weston stated that he did not see how Urban's motorcycle got onto the roadway, because he "wasn't paying attention to [the motorcycle]" but instead was looking at Richards. [Exh. 40 at 172:8-9]. Weston then reiterated that "if he saw some peripheral vision, someone coming up the road at a high rate of speed, he would have seen it." [Exh. 40 at 172:9-12].

77.  Murray testified at trial that speed was "at the top of the list" in terms of significant factors the defense considered in calculating its probability of winning.

78.  Murray sent an email to Carroll in June of 2018 stating that Richards' testimony describing Urban's "high speed" would bolster their defense position.  [Exh. 76 at ZUR1433].

79.  Urban testified in his deposition that he estimated going 25 to 30 mph when he entered the intersection.  [Exh. 39 at 45:14-17; Exh. 9].

80.  During Richards' deposition, she testified that Urban's speed was the cause of the accident. She stated that Urban was going "way too fast" in the heavy traffic conditions, and estimated that he was going 25 to 30 and 30 to 40 mph.

81.  Carroll's June 18, 2018 report to Murray summarized Richards' deposition, explaining that Richards maintained Urban was going 30-40 mph, driving "recklessly" and was at fault. [Exh. 20, 1435-7; Dkt. 128-1 at ¶ 9; Exh. 19 at 79:18-22, 80:18-81:5].

82.  Alvino's report relied on statements by Urban and Richards to use 30 mph as a base for her calculations to determine Urban's reaction times when he entered the intersection.

83.  Based on the evidence presented, the Court finds that Urban was going roughly 30 mph when he entered the intersection, which was an unreasonable speed given the heavy traffic conditions.

### F.  Reasonable Investigation

84.  The Massachusetts insurance industry's custom and practice for properly investigating a claim requires obtaining as much information available and do so in a timely manner before evidence is destroyed, damaged, lost or forgotten.  [TTIV at 76:12-15].

85.  An insurance claim has two types of evidence: objective and subjective.  Objective evidence includes physical evidence, such as road conditions, weather conditions, and photographs.  Subjective evidence is a person's observations and perceptions of what they observed or heard. [TTIV at 76-77].

86.  Claims adjusters routinely review debris fields in accident photographs to determine the point of impact.

87.  Shortly after receiving Urban's claim, Murray declared it a priority to retain an accident reconstructionist to evaluate factors needed to determine liability.  [Exh. 8 at ZUR0417; see also TTI at 113:24-114:13]

88.  Carroll and Murray considered hiring an expert to determine whether Weston was moving at the point of impact, and to determine Urban's speed at the time of the collision.  [TTI at 119:3-14].  At a point during this timeframe, the defense believed an accident

reconstructionist was needed to "fully investigate the issue." [Exh. 11 at ZUR0549; <u>see also</u> Exh. ZUR00382, 0375, 0406, 0549, 1284, 1363].

89.   Throughout much of litigation, Murray was aware that an accident reconstructionist was necessary to review the evidence to determine the point of collision.

90.   Zurich set aside a budget of $10,000 for experts. [TTI at 112:5-17].

91.   Acquiring an accident reconstructionist remained an action item for Zurich, from 2014 to at least 2017. [Exh. 8 at ZUR0417; Exh. 15 at ZUR1284].

92.   Butler was hired early on to conduct the initial investigation in 2014. He relied on documents, photos, police reports, and interviews with Weston and Urban, and in his report, he provided background information on both individuals. Zurich never retained Butler to provide relevant expert testimony nor to provide an accident reconstruction analysis.

93.   As of May 6, 2016, the efforts of Carroll's private investigator consisted of gathering information about Urban's financial background, including facts that his mother lived in public housing and that Urban had a child support lien against him. [Exh. 12 at ZUR0698].

94.   Included in Urban's 2016 settlement demand package to Zurich was Alvino's collision analysis report, dated September 12, 2014, concluding that Weston struck Urban's motorcycle while Weston's van was in motion, turning left. Alvino also reached a conclusion regarding Urban's speed and Weston's speed at the point of collision.

95.   Alvino's report included a disclaimer that not all facts and circumstances were known when she conducted the analysis in 2014, and she reserved the right to amend her conclusions upon new information being presented.

96.   Murray suggested this disclaimer meant her report should not be considered a factual report.

97.   Murray offered at trial what he perceived as deficiencies in Alvino's report. For example, a line in her report that read: "As he entered the intersection . . . the van suddenly pulled forward to make a left turn striking the motorcycle." Murray concluded that this line was "at odds" with the "point of impact." [TTIII at 165:10-15].

98.   Carroll similarly concluded that Alvino took "substantial liberties in her assessment of how the accident occurred," that there were mistakes in her report, and that the report was "obviously biased." [Exh. 15 at ZUR01280].

99.   Surprisingly, Carroll testified that Alvino's report posed no concern to the defense and that it was helpful. [TTIII at 36:10-17]. Presumably, he relied on his skills as a cross-examiner, as he did not have a counter expert opinion.

100. Also, Carroll testified at trial that he was very familiar with Alvino and had "used her a couple of times" for his own matters.  [TTIII at 21:6-9].

101. In direct contrast to the evidence documenting Zurich's strategy leading up to trial, Carroll testified at trial in this action that an accident reconstruction expert was not required, and that it was his recommendation that Zurich need not hire one.  He opined that the case "did not lend itself to much of an accident reconstruction analysis."  [TTIII at 20:19-21:19].

102. At trial, however, Carroll also provided his interpretation of the accident photographs and made conclusions about where and how the impact happened, based on the location of damage on the van displayed in the photographs.  [TTIII at 32:5-18].  During cross-examination, however, he admitted that "you can't say what the point of impact is using the photographs."  [TTIII at 123:20-21].

103. Carroll further testified about the impact between the motorcycle and the second vehicle, providing his analysis of how the injuries of the second motorist—the vehicle struck by Urban's motorcycle after Urban and Weston's van collided—indicated the speed at which Urban was traveling.  [TTIII at 62:1-63:10].

104. At some point, Carroll spoke to Dennis Lyons, a forensic accident reconstructionist, of S.D. Lyons, Inc. about the accident and "the concept of whether you could ever say to a reasonable degree of scientific certainty that this damage profile was caused by a vehicle striking the van while it was stationary." Lyons told Carroll that he "couldn't tell [Carroll] that in a way that would be admissible at trial." Carroll did not provide him with the photographs of the scene to Lyons and did not ask him to determine whether he would be able to offer an opinion on the "damage profile."  [TTIII at 120-122].  Ultimately, Zurich also did not have an expert testify at either trial.

105. Murray testified that based on Alvino's expert report and Carroll's recommendations, it was not necessary for Zurich to hire its own accident reconstruction expert. Alvino's findings were inconclusive as to liability being clear, and provided information that was helpful to the defense, thereby resulting in a defensible case.  [TTIV at 55:2-21; 56:6-57:2].

106. However, as previously discussed, Murray reviewed the photographs from the accident scene and other available evidence from the parties and formed a conclusion as to where the impact occurred in the intersection.  See supra ¶ 58.

107. Carroll's and Murray's abandonment of an accident reconstructionist or any expert came after repeatedly stating in reports and correspondences for at least three years that an accident reconstructionist was needed to fully investigate and determine liability.  Even after receiving Alvino's report, Murray's August 2017 BI Report still listed retaining an accident reconstructionist as an action item.  [Exh. 17 at ZUR1363].

108. After delaying the liability determination, due to the need for an accident reconstructionist, Murray and Carroll ultimately declined to hire an accident reconstructionist or expert at some point after 2017.  They reasoned it would not be helpful, and liability was impossible

to determine.  [TTI at 113:24-114:4; TTIII at 20:19-21:18; 120:7-121:3; TTIV at 55:2-18; 56:19-57:2; 70:3-5].

109.  The Court finds neither Carroll's nor Murray's testimony credible as to their reasons for abandoning an accident reconstructionist, nor their representations that an expert would not add value or clarity to the issue of liability—especially in light of their attempts to provide testimony in place of an accident reconstructionist or expert.  It appears they abandoned the recommendation for an accident reconstructionist when their potential expert, Lyons could not support Carroll's theory of the case.

## G.  Zurich's Liability Conclusions

110.  Murray stated he believed liability was never reasonably clear, stating "[w]e felt that we were going to win the case.  For me, my interpretation of liability being reasonably clear, is that there is very little discussion or doubt or question in terms of the facts of, you know, who's at fault, legal liability."  In support of this statement, Murray pointed to the low percentage or chance a plaintiff's verdict would be awarded.  This percentage was based on the defense's analysis of the evidence.  [TTIV at 54].

111.  However, the liability percentages Murray and Carroll manufactured considered factors other than liability.

112.  For example, Zurich's December 16, 2014 MCU Case Summary estimated that Massachusetts state law imposes "a rebuttable presumption of negligence and a burden of care on a vehicle operator who attempts to negotiate a left-hand turn across oncoming lanes of traffic," and that there was a 60% chance that a plaintiff's verdict would result.  [Exh. 5 at ZUR0378, ZUR0380].  In later reports, Carroll estimated the chance of a plaintiff's verdict to be 50%, noting that there was "a 50/50 chance that a jury would find our client was not at a complete stop and, after being waved into the intersection, proceeded without looking" and placed the estimated value of the case, if litigated, at $274,350.  [Exh. 21 at ZUR1455].

113.  Without retaining an expert, Murray testified that the probability of Urban's verdict went from 60% in December 2014 [Exh. 4 at ZUR0378] to 40% in August 2017 [Exh. 17 at ZUR1362] and his estimation of Urban's damages decreased.  He explained "the original number is making an assumption that perhaps, you know, we see a more formidable or strong expert report at some time in the future . . . the early assessment is very much a forecast."  [TTIV at 50:4-21].

114.  Zurich's liability analysis frequently conflated calculations of what a jury may perceive with the evaluation of a party's actual liability.

115.  Throughout Zurich's assessment of liability, Murray and Carroll heavily considered, and to some extent, relied upon the general perception that juries have of young, male motorcyclists and the low success rate of motorcyclist plaintiffs before a jury.  [See, e.g.,

Exh. 21 at ZUR1456; Exh. 38 at ZUR1299; Exh. 7 at ZUR0416; TTIV at 36: 6-37:15; TTI at 93:5-12; TTI97:17-19].

116. Specifically, Murray stated, "[t]here is also believed to be a historical prejudice most juries have against motorcyclists in accident scenarios where liability is disputed." [Exh. 22 at BSL1820].

117. Under the comparative and joint liability section, Zurich's August 2018 pre-mediation reports indicated that "there is a very good chance that jurors are familiar with the reckless manner in which young motorcyclists weave through traffic." [Exh. 21 at ZUR1456].

118. Murray also felt it relevant to include in his August 2017 MCU report that Urban was a "recovering heroin addict" in his analysis, albeit this fact was later proven to be false. [Exh. 17 at ZUR1361].

119. Next, the weight Zurich placed on Urban's comparative negligence was often overstated or unsupported by the evidence.  For example, on December 23, 2014, Murray wrote to Zurich that IESC strongly believes "Urban was the cause of his own injuries in basically 'creating his own lane' between the two stopped southbound vehicles."  [Exh. 7 at ZUR0416].

120. Even in an email dated February 11, 2021, Murray stated to Zurich that Urban "veered at a high rate of speed between two southbound vehicles . . . and struck the drivers' side front corner of the insured's vehicle."  [Exh. 45 at ZUR1680).  Murray continued that liability was "[v]ery questionable" because Richards' testimony supports the narrative that Urban was "operating a performance level motorcycle at high speed . . . between two mostly-stopped lanes of southbound traffic . . . presumably to 'beat the light.'" [Id. at ZUR1680-1681].

121. Murray and Carroll continued to cite, emphasize, and endorse the unsupported material fact that Urban was weaving through traffic or weaving between vehicles to create his own lane, throughout Zurich's evaluation of liability from 2014 throughout 2021.  [See Exh. 4 at ZUR0271; Exh. 5 at ZUR0375, 0377; Exh. 7 at ZUR0416; Exh.16 at ZUR1290; Exh. 17 at ZUR1360-1361; Exh. 19 at 109:17-110:2; and Exh. 21 at ZUR1451].  Zurich counsel used this fact to support their conclusions regarding comparative negligence and the unlikelihood of a jury finding in favor of Urban, even when it was clear these allegations were not true.  [See Exh. 21 at ZUR1451; Exh. 16 at ZUR1292; Exh. 17 at ZUR1361].

122. Murray's letter in response to Urban's settlement also concluded, without consulting an accident reconstructionist or expert, that "there is simply no way the van could have accelerated from a complete stop to cause the amount of damage that resulted in this collision."  [Exh. 16 at ZUR1289].  In these responses, Murray is responding as an advocate rather than someone tasked with carrying out an objective and fair evaluation of the evidence.

123. Likewise, without consulting with an expert and disregarding Richards' testimony, Carroll concluded that Weston was not moving at the time of impact and felt the evidence corroborated this fact. He stated it was always Zurich's position that Weston was not moving at the time of impact. [TTIII at 30:23-31:3].

124. Carroll's opined that the case was and continued to be highly defensible because of Richards' deposition testimony, stating: "if you take her testimony on balance, then the only logical and reasonable conclusion that you can draw, the only third-party disinterested witness in the whole case that testified at trial, said the accident was a result of the motorcycle at a high rate of speed under the circumstances that undeniably were inappropriate for such operation, was the cause of the accident." [TTIII at 24:10-23]. Zurich adopted this opinion.

125. On February 11, 2019, Carroll reported to Murray he was unable to depose Johnston. Johnston was reluctant to participate in the deposition and then stopped returning calls from Carroll's office. Carroll testified that his failure to get Johnston's testimony had no impact on the case because there was "ample evidence to support a defense in this case" based in Richards's testimony. In support of this conclusion, Carroll relied on Richards' statement (as the only disinterested witness) that the accident occurred because of the way Urban was riding his motorcycle. Carroll reiterated that "the great weight of the evidence without Johnson was overwhelmingly in favor . . . of the conclusion that the accident was Mr. Urban's fault."

126. Zurich's comparative negligence analysis as to liability was conflated with the defense strategy and the likelihood that a jury may be persuaded by their negative experiences with, or perceptions of, young motorcyclists.

127. Zurich believed the "strongest defense lies in a strong comparative negligence defense," and that Urban's speed and his "failure to exercise reasonable care are the primary cause[s] of the accident." [Exh. 21 at ZUR1451].

128. On January 31, 2017, Carroll informed Murray of the receipt of Urban's demand package, stating: "We feel that liability against our client is not reasonably clear . . . we feel there is a very strong comparative negligence defense . . . . On the contrary, we are convinced that Mr. Urban either caused or contributed significantly to the accident . . . . As discussed above, we feel there is a very strong comparative negligence defense in this case." [Exh. 15 at ZUR1284].

129. Carroll stated that while he always considered the possibility that a jury may find Weston negligent, he believed that a jury could find Urban's comparative negligence was clear and substantial. He continued that the likelihood of success at trial need not be 100 percent for him to consider the case reasonably defensible. [TTIII at 65:15 – 66:12].

### H. Zurich's Credibility Assessments

130. Throughout the course of its liability assessments and investigation, Zurich failed to scrutinize witnesses and information that favored Zurich's defenses with the same rigor that it used on evidence that favored Urban.

131. There are multiple examples of Zurich scrutinizing Urban's account of the accident.

132. Murray did not find Urban's account of how the accident happened credible. Understandably, Murray questioned Urban's description of the traffic during rush hour as only "moderate," which "was seemingly at odds with pretty much everyone else's version of the accident that we were aware of at that point, and certainly at odds with my own personal experience."  Murray also questioned Urban's account of how the van suddenly turned left and hit him, which Murray testified "seemed to be . . . at odds with the—in terms of the point of impact."  [TTIII at 165:1-2].

133.  Further, Carroll's May 2018 report to Murray states:

> We were also pleased that Mr. Urban placed the speed of his motorcycle at the time of impact at 20-30 m.p.h.  Certainly, he has incentive to underestimate his speed, which will give greater credence to the estimate Ann Marie Richards, who estimated the speed at 30-40 m.p.h.  In short, the speed of the motorcycle was most certainly a cause of the accident. Regardless of the legal right of way, all drivers are under an obligation to exercise due care in the operation of their vehicles.  Entering a congested intersection at 20-30 miles per hour is simply not the exercise of due care.

[Exh. 18 at ZUR1432].

134. On June 19, 2018, Murray emailed Carroll after reading the deposition summaries of Urban and Weston characterizing their depositions as overall favorable to Weston because of Urban's "guarded" and "inaccurate" testimony.  Murray also mentioned that Richards' testimony describing Urban's "high speed" would bolster their defense position.  [Exh. 76 at ZUR1433].

135. However, there is no evidence that Murray seriously questioned Weston's testimony or evidence that weakened Weston's credibility.

136. On May 20, 2015, Carroll wrote it was concerning that Weston described the accident as a "fender bender" when reporting the accident to his supervisor, given the severity of the accident.  [Exh. 11 at ZUR0548].

137. There is also no record of Zurich applying any weight to Weston's driving history other than their expressed concern that counsel would discover it.  Carroll's May 11, 2018 report to Murray also included the following:

> During our deposition preparation with Mr. Weston, we learned that Mr. Weston had been involved in several accidents during his time at Interstate, including an accident that occurred immediately prior to his departure from Interstate.  We were concerned that plaintiff's counsel would seek to connect the history of accidents . . . .  Fortunately, Plaintiff's counsel did not inquire any further into the circumstances of his departure from Interstate.  More importantly, plaintiff's counsel did not ask Mr. Weston about his history of accidents, at all . . . . Mr. Weston indicated that he knew a couple of the officers that were on scene . . . . Mr. Weston did identify another officer, without being asked . . . . Fortunately, plaintiff's counsel did [sic]seek further information on his familiarity with this officer.

[Exh. 18 at ZUR1430-1431].

138.  There is no evidence that Zurich seriously considered, questioned, or weighed Weston's connection with the first responders and investigating police department and the evidence collected.  Weston had a "clean driving record" according to Butler's Report—despite his several accidents while driving for Interstate—and Weston was a "long time former police officer in Billerica." [Exh. 4 at ZUR0267, 0269-0270].  This is one reason Zurich gives Weston's testimony more weight (and anticipated jurors would as well).

139.  There is no record of Zurich scrutinizing or questioning with a healthy dose of skepticism, the fact that several Billerica police officers were present at the scene of the accident, some of whom Weston had worked with when he was part of the department, to include the officer in charge of "traffic enforcement" and the officer who took photos of the scene of the accident.  [Exh. 40 at 101:10-103:7].

140.  Murray and Zurich failed to complete an unbiased review of the evidence compared to Weston's version of events, which contained conflicting details about his location and actions compared to the photographs of the accident and the damage to the van.  (TTIV at 105:8-106:15).

141.  Zurich gave more weight to the favorable evidence from Richards' testimony and minimized or ignored evidence to the contrary.  While Murray acknowledged Richards' unfavorable account of Weston moving when the impact happened, he reduced its importance and adopted Weston's uncorroborated version of events.  Murray ignored Richards' testimony that she never saw Urban weaving through vehicles, creating his own lane.  He instead focused on Richards' conclusion that Urban's speed caused the accident.  Accordingly, Murray concluded that the balance of her testimony was in favor of Weston.

## I.  Settlement Offers Leading up to the Underlying Superior Court Trial

142.  Zurich was aware early on of the severe injuries Urban suffered.  In an email sent to other Zurich personnel on December 18, 2014, Murray described Urban's injuries as "catastrophic" and estimated the medical costs alone to be "at least" in the range of a "quarter million."  [Exh. 7 at ZUR0416].

143. However, in assessing risk, Carroll was confident that if the case were tried, a jury would reply on their "life experience[s]" involving the "reckless manner in which young motorcyclists weave through traffic." [Exh. 21 at ZUR1456; TTIII at 57:18-58:14].

144. As a claims handler for Zurich, Murray's job was to settle the case within Zurich's evaluation of the case value, if possible. According to Murray, settling the case for less than the evaluation was not the goal. Murray testified that Zurich's fair evaluation of Urban's matter was slightly over $300,000.

145. On November 29, 2016, Urban's attorney made a demand for $1.5 million, but was willing to "execute a release in [the] insured's favor in the amount of [its] 1M policy limit and would not make any attempt to pursue [the company's] assets." The demand package included doctors' reports, medical bills, a lost wage form from Urban's employer, Alvino's collision analysis report, photographs of the accident location and photographs of Urban taken at various dates.

146. In the February 23, 2017 response, Murray provided a counteroffer of $100,000.

147. The first mediation took place in July of 2017, in which Urban reduced his demand to $950,000, that Zurich countered with a $125,000 offer. Urban further reduced his demand to $925,000 during this mediation; however, no settlement was reached.

148. According to Murray, the August 2017 MCU report largely, "if not entirely," remained the same as the December 2014 MCU report except the lost future wages damages.

149. The August 2017 MCU report 'zeroed out' or reflected a zero amount for the future lost wages amount under the special and general damages chart. [Exh. 17 at ZUR1362; TT III at 177:2]. Murray explained that this value reflected Urban's return to full-time employment, earning "substantially" more money than prior to the accident. [TTIII at 177:7-10]. Murray's adjustment of Urban's future lost wages in the 2017 MCU report was revised since the 2014 MCU report, which projected future wage damages between $20,000 and $215,000. [Ex. 5, ZUR0380; TTIII at 177:16-17].

150. The parties participated in a second mediation on October 22, 2018, where Urban again reduced his demand to $910,000. Zurich countered with $200,000.

151. Following the second unsuccessful mediation, roughly a few weeks before jury trial of the underlying matter, on February 11, 2021, Zurich offered to settle the matter for $300,000. Urban countered with a demand of $500,000, which he withdrew on February 17, 2021.

**J.  Superior Court Trial and Post Trial Demand**

152. On January 27, 2021, due to the Covid-19 pandemic, the Superior Court of the Commonwealth of Massachusetts offered the parties the option to try the case before a 3-judge panel in lieu of a jury.

153. The parties tried the matter before a three-judge panel in Superior Court.  On March 3, 2021, the panel returned a verdict finding Weston 90% negligent and Urban 10% negligent, awarding $1,068,944.21.

154. On March 4, 2021, the Superior Court entered a revised judgment for $1,420,679.13, reflecting damages totaling $962,049.79 (a 10% reduction of the $1,000,068 awarded) and $458,629.34 of prejudgment interest.

155. On March 5, 2021, Urban served a Chapter 93A demand letter to Murray alleging violations of M.G.L. c. 176D § 3(9), (c), (d) and (f).  Urban demanded that (1) Zurich pay the entire amount of the judgment, including statutory interest; and (2) an additional $2,872,928.90 payment in settlement of his Chapter 93A/176D claims.

156. On April 2, 2021, Zurich responded to Urban's Chapter 93A demand letter denying liability and making a $70,000 settlement offer under Chapter 93A's safe harbor provision for any loss of use damages incurred by Urban.  In making this offer, Zurich used the value of a $500,000 offer it anticipated could have made to settle the case in October 2018, and then applied a 6% interest rate to that settlement amount through the date of the April 2, 2021 letter.  Zurich also noted in its response letter that it would pay the judgment shortly, to include the $458,629.13 in prejudgment interest.

157. Urban rejected Zurich's April 2 offer and filed this suit, asserting 93A and 176D claims.

158. Zurich paid Urban the full amount of the underlying judgment on April 5, 2021.

## II.     CONCLUSIONS OF LAW

### A.  Applicable Law

Chapter 176D, Section 3, of the Massachusetts General Laws provides that insurance companies have an obligation to "effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear."  M.G.L.  c. 176D, § 3(9)(f); Gore v. Arbella Mut. Ins. Co., 77 Mass. App. Ct. 518, 525, 932 N.E.2d 837, 844–45 (2010).  Chapter 93A provides the legal framework in cases of Chapter 176D violations.  Capitol Specialty Ins. Corp. v. Higgins, 953 F.3d 95, 105 (1st Cir. 2020) ("Higgins II").  In other words, Chapter 93A provides the statutory basis for damages when insurers engage in unfair or deceptive claims-handling practices that violate Chapter 176D.  Hopkins v. Liberty Mut. Ins. Co., 434 Mass. 556, 563, 750

N.E.2d 943, 949 (2001); see M.G.L. c. 176D, § 3 (describing unfair methods and deceptive

insurance practices); R.W. Granger & Sons v. J & S Insulation Inc., 435 Mass. 66, 80, 754

N.E.2d 668, 680 (2001).  In cases where insurers fail to effectuate prompt and fair settlements as

required by Chapter 176D or engage in unfair or deceptive conduct, "recovery shall be in the

amount of *actual damages*; or up to three, but not less than two, times such amount" if the

violative conduct is wilful[4] or knowing.  R.W. Granger, 754 N.E.2d at 680; M.G.L. c. 93A, §9(3)

(emphasis added).

### B.  Whether Liability was Reasonably Clear

An insurer's duty to settle arises only when "liability has become reasonably clear."

M.G.L. c. 176D, § 3(9)(f).  Determining whether the defendant's liability in a case became

"'reasonably clear' calls for an objective standard of inquiry into the facts and the applicable

law." Demeo v. State Farm Mut. Auto. Ins. Co., 38 Mass. App. Ct. 955, 956, 649 N.E.2d 803,

804 (1995).  Specifically, "[t]he fact finder determines 'whether a reasonable person, with

knowledge of the relevant facts and law, would probably have concluded, for good reason, that

the insure[d] or ([or insurer]) was liable to the plaintiff." McKinnon v. Unum Grp., 516 F. Supp.

3d 49, 64 (D. Mass. 2021) (quoting McLaughlin v. Am. States Ins. Co., 90 Mass. App. Ct. 22,

29-30, 55 N.E.3d 1007, 1014 (2016)).  Relevant factors include: "insurance industry practices in

similar circumstances, expert testimony that the insurer violated sound claims practices, the

defendant's own evaluation of the plaintiff's claim, and advice given to the insurance company

on the probability of success at trial." McKinnon, 516 F. Supp. 3d at 61 (quoting O'Leary-

Alison v. Metro. Prop. & Cas. Ins. Co., 752 N.E.2d 795, 798 n. 3 (2001)).  Factors that should

not influence the evaluation of liability include "the cost of the defense, the size of the plaintiff's

---

[4] Chapter 93A refers to willful as "wilful."  For consistency, the Court uses the Chapter 93A spelling throughout its
opinion for consistency.

demand, and the insurer's 'business judgment' [which] are all unrelated to the likelihood of the defendant's liability."  Demeo, 649 N.E.2d at 804 (finding the trial court erred in considering impermissible factors to determine liability).

While determining whether liability is clear "encompasses both fault and damages," Clegg v. Butler, 424 Mass. 413, 421, 676 N.E.2d 1134, 1140 (1997), "an insurance company may [not] avoid its legal obligation to make a prompt and fair settlement offer simply by disputing how much is owed in damages."  Hache v. AIG Claims, Inc., No. CV 20-10652, 2023 WL 8720051, at *2 (D. Mass. Dec. 18, 2023).  Allowing this would set a dangerous precedent, enabling insurers to dodge their statutory obligation to make settlement offers whenever there is a disagreement over damages—such as disputes overcompensation for pain and suffering, which are quite common.  See 2023 WL 8720051, at *2.  In response to the inevitable gamesmanship involved in estimating damages and anticipating success at trial with respect to determining liability, courts have held insurers responsible when:

> "(1) it is reasonably clear that the plaintiff has suffered substantial injury caused by the negligence of the defendant, and (2) the extent of those injuries is reasonably clear. It does not mean that it is reasonably clear how much a jury would award the plaintiffs for pain and suffering or loss of consortium, because juries hearing the same evidence plainly will differ in the amounts they award to compensate plaintiffs for these intangible losses."

Rhodes v. AIG Domestic Claims, Inc., No. CIV. A. 05-1360-BLS1, 2008 WL 2357015, at *15 (Mass. Super. June 3, 2008), aff'd as modified, 78 Mass. App. Ct. 299, 937 N.E.2d 471 (2010), aff'd, 461 Mass. 486, 961 N.E.2d 1067 (2012).  In other words, "when it is reasonably clear that an insurer is liable, then an obligation to offer a settlement arises—even when there are disputes as to comparative fault or the extent of damages."  Hache 2023 WL 8720051, at *2.

Additionally, the presence of a triable issue of fact does not automatically prevent liability from being reasonably clear. Terry v. Hosp. Mut. Ins. Co., 101 Mass. App. Ct. 597, 611, 195 N.E.3d 441, 453, n. 20, review denied, 490 Mass. 1109, 197 N.E.3d 866 (2022) ("However, as we have held, the existence of triable issues of fact does not necessarily mean that liability is not reasonably clear."). Insurers have an obligation to thoroughly investigate before concluding liability cannot be determined. See Clegg, 424 Mass. at 421 (discussing an insurer's obligation to investigate claims thoroughly before making a determination of liability). After all, Chapter 176D, § 3(9)(f) does not "penalize insurers who delay in good faith when liability is not clear and requires further investigation." Clegg, 424 Mass. at 421; Scott v. Vermont Mut. Ins. Co., No. CIV.A. 07-12081-DPW, 2011 WL 4436984, at *8 (D. Mass. Sept. 22, 2011). In conducting its evaluation of the facts, the insurance company is required to do more than "'cherry-pick facts favorable to it' or disregard unfavorable evidence and instead, [must] assess the evidence objectively." Terry, 195 N.E.3d at 450. An insurance company's failure to "take even the most basic steps toward obtaining an independent or neutral assessment of [] potential fault," especially its failure to consult an expert, is "at best inattentive, if not incompetent." McLaughlin, 55 N.E.3d at 1016.

Zurich takes the position that the mere presence of triable facts prevented liability from being reasonably clear. The Court rejects this flat application of the standard, recognizing that most insurance matters involve underlying tortious acts with questions of fact. Without requiring more, the reasonably clear liability standard would be virtually meaningless. At minimum, a reasonable investigation is required to uncover liability.

i.    **Reasonable Investigation**

Liability may arise from refusal "to pay claims without conducting a reasonable investigation based upon all available information."  M.G.L. c. 176D, § 3(9)(d). "Recovery on a theory of inadequate investigation is limited to circumstances where, if an adequate investigation had been conducted, liability would have been reasonably clear."  McKinnon, 516 F. Supp. 3d at 61 (quoting Spinal Imaging, Inc. v. Aetna Health Mgmt. LLC, No. CIV. 09-11873-LTS, 2014 WL 4202498, at *14 (D. Mass. Aug. 21, 2014)).  Courts have found violations where there was a failure to take concrete actions that may support a finding or conclusion.  See Sterlin v. Com. Ins. Co., No. 200301965, 2009 WL 323455, at *8 (Mass. Super. Feb. 2, 2009). (finding a violation where the insurer "failed to interview parties and persons with knowledge of the facts of the accident," and failed to obtain photographs of a damaged vehicle prior to repair); Martinez–Rivera v. Com. Ins. Co., 2011 WL 3276684, *8 (Mass. Super. Ct. April 11, 2011) (finding a violation where the adjuster "purposefully and strategically" failed to pursue a line of inquiry because he suspected it would be unfavorable to the defense); Gentile v. Com. Ins. Co., 2006 WL 2766358, *4 (Mass. Super. Ct. Sept. 13, 2006) (citing specific lines of inquiry not pursued by insured in its investigation as supporting the conclusion that a reasonable investigation was not conducted).

From 2014 to 2017, following the accident, Carroll and Murray maintained that retaining an accident reconstructionist was critical to fully investigate liability.  Murray eventually abandoned this idea and decided to not utilize the expertise of an accident reconstructionist to help provide an independent assessment of the objective evidence.  Murray and Carroll appear to rely upon their own non-expert opinions and theories about the accident.  These failures indicate Zurich conducted an unreasonable investigation.  The court in McLaughlin affirmed the trial

judge's conclusion that the defendant failed to conduct a reasonable investigation as required by Chapter 176D.  McLaughlin, 55 N.E.3d 1007 at 1016.  There, the defendant "failed to subject [insured's] initial denial of responsibility to serious scrutiny and failed to take even the most basic steps towards obtaining an independent or neutral assessment of his potential fault."  Id. McLaughlin also concluded that the "greatest concern" was defendant's "failure to consult an expert . . . despite [] recognition of the need for one."  Id.

Obtaining an expert, specifically an accident reconstructionist, to determine Urban's speed as he entered the intersection, points of impact, and whether Weston was moving, remained an action item in Zurich's report for nearly four years, even after receiving Alvino's expert opinion.  Murray (at one point) believed the expert would be able to review photographs of the accident and physical evidence to determine the point of the collision.  At trial, Carroll and Murray provided unsatisfactory and often contradictory rationale for why they abandoned their plans to retain an accident reconstructionist and offered no evidence to corroborate their shift in strategy.  Carroll contacted one expert, (Lyons), at some time that he could not recall.  During this conversation, Carroll did not provide the photographs of the accident scene or the damaged vehicles to the expert.  He merely described the situation over the phone.  Following this call, there were no efforts to obtain another expert opinion after concluding that this matter was "simply not" an accident reconstructionist case.  There is no evidence indicating when he determined this.  It is a reasonable inference that Carroll did not receive the advice or opinion he was hoping for—one that aided Weston rather than Urban.  Carroll and Murray then spent hours of the Court's time attempting to provide unqualified, layperson testimony interpreting objective evidence in the same photographs Murray previously deemed "inconclusive," providing their respective theories on where the impact occurred, whether Weston was moving, and how fast

Urban was going—all testimony that an expert or accident reconstructionist would have provided.

Alvino—an expert that Carroll previously retained on other matters—provided an accident analysis report that provided plausible conclusions based on objective evidence, as to speed, points of impact and other relevant factors.  Zurich did not have any competing expert report or opinion, which would have supported its critiques of Alvino's report.  At the very least, a competing opinion would have afforded credibility to Zurich's argument that it conducted a reasonable investigation.  See Capitol Specialty Ins. Corp. v. Higgins, 203 F. Supp. 3d 200, 213 (D. Mass. 2016) ("Higgins I") (comparing investigations for the purpose of assessing whether a limited investigation violated Chapter 176D, § 3(9)(d)).  Instead, Murray and Carroll cherrypicked the conclusions in the report that supported their theory, and simply discredited the rest.  This is insufficient to meet the requirements of a reasonable investigation or neutral evaluation of potential fault.  See McLaughlin, 55 N.E.3d at 1016 (finding an insurance company's failure to "take even the most basic steps toward obtaining an independent or neutral assessment" or consult an expert, was incompetent.).

In general, insurance companies are not obligated to retain an accident reconstructionist but, in this case, everyone deemed it was necessary.  Neither witnesses' rationale for abandoning the accident reconstructionist nor their efforts to discredit the value of an expert in determining liability was credible.  Based on the evidence, it is more likely that Zurich abandoned an accident reconstructionist or expert when it became clear its defense theory would not be supported.  Ultimately, Zurich delayed in finalizing its assessment of liability due to the need to investigate fully (by hiring an expert), and then, without explanation, abruptly determined there was no need to investigate fully.

Notwithstanding the failure to retain an accident reconstructionist, perhaps the most troubling failure is the absence of any neutral evaluation of the evidence by Zurich.  Turning a blind eye to material evidence and failing to credit or give appropriate weight to readily available information related to liability are clear indications of a failure to conduct a reasonable investigation.  See Sterlin, 2009 WL 323455, at *8.  As the insurer, Zurich—namely Murray—had an obligation to conduct a neutral assessment of liability, separate from Carroll's litigation strategy.  Terry, 195 N.E.3d at 450 (discussing the insurance company's obligation to do more than "'cherry-pick facts favorable to it' or disregard unfavorable evidence and . . . assess the evidence objectively.").  Murray did not act with objectivity, nor did Carroll aid him in that responsibility.  Instead, Murray joined Carroll as an advocate rather than a neutral evaluator, and in doing so, cherrypicked testimony that supported Zurich's defense.  While he may have "taken into consideration" Weston's testimony that he was not moving at the time of impact, Murray placed undue credence to his version because he was the only witness that testified to this.  Murray deemed Weston's version of the crash more credible than the other witnesses.  Murray gave little to no weight that Weston had been involved in a number of other accidents while working for Interstate, or that Weston mischaracterized the severity of the accident when he first reported the crash to his supervisor.  Murray completely ignored the fact that Weston insisted Urban was weaving in and out of traffic, and creating his own lane despite never seeing it.  Murray then heavily relied upon, and parroted this false narrative throughout reports and correspondences on liability, failing to apply any semblance of "serious scrutiny" to all evidence and witnesses alike, even after he learned that was not true.  See McLaughlin, 55 N.E.3d 1007, 1016 (2016).

The failure to give proper weight (or any weight at all) to all of these considerations indicates a failure to conduct a reasonable investigation.  See Sterlin, 2009 WL 323455, at *8. Accordingly, for all the aforementioned reasons, Zurich did not conduct a reasonable investigation.

The Court now considers the liability imposed by the right-of-way statutes, M.G.L. c. 89 § 8 and c. 90, § 14, and the speed regulation statute, c. 90, § 17.

**ii.     The Right-of-Way**

The Court first reviews the standard of care owed by Weston in attempting a left turn into oncoming traffic, and the right-of-way Urban was entitled to.  M.G.L. c. 89, § 8 provides, in part:

> When two vehicles approach or enter an intersection of any ways . . . at approximately the same instant, the operator of the vehicle on the left shall yield the right-of-way to the vehicle on the right. Any operator intending to turn left, in an intersection, across the path or lane of vehicles approaching from the opposite direction shall, before turning, yield the right-of-way until such time as the left turn can be made with reasonable safety.

Additionally, G.L. c. 90, § 14, provides in part:

> When turning to the left within an intersection . . . an operator shall yield the right of way to any vehicle approaching from the opposite direction, . . . which is within the intersection or so close as to constitute an immediate hazard.

The statutory right-of-way is not absolute.  Generally, "possession of the right of way is [ ] only one factor for the jury to take into account in determining whether an operator performed his duty of due care or was negligent."  Preston v. Raia, 2008 Mass. App. Div. 280 (Dist. Ct. 2008) (quoting Ballinger v. Plymouth & Brockton St. Ry. Co., 361 Mass. 61, 64, 278 N.E.2d 398 (1972)); see also Canane v. Dandini, 355 Mass. 72, 76, 242 N.E.2d 854 (1968) ("[A] driver who has the right of way at an intersection may be negligent, or even foolhardy, if he asserts his right on some occasions.").  Possession of the right of way is only one factor to be considered in

deciding whether the operator has fulfilled his duty of due care.  Anthony v. Jancsics, 2001 Mass. App. Div. 137 (Dist. Ct. 2001).

Zurich's December 2014 MCU Case Summary acknowledges the "rebuttable presumption of negligence and a burden of care on a vehicle operator who attempts to negotiate a left-hand turn across oncoming lanes of traffic," and the argument that Weston had the duty of care.  Murray testified, and included in his reports to Zurich, that the critical fact determining liability was whether Weston was moving at the time of the collision.  This would determine whether Weston encroached upon Urban's right-of-way, in violation of Chapter 89.  He later revised this position to argue that it was Urban's speed that was the focus of the liability assessment.  Nevertheless, Murray identified the location, in terms of what lane the collision occurred—in Urban's southbound lane or Weston's northbound lane—as key evidence indicating whether Weston was moving at the time of impact.  He then testified that it was his opinion that the collision took place in Urban's southbound lane (however, he did not find it necessary to include this analysis in any of his reports to Zurich).  Weston testified during his deposition that the collision occurred "closer to the right southbound lane" or in other words, the part of Urban's lane that was closest to the far right lane that Richards was in.  Based on this information, coupled with Richards' unwavering account of Weston's van moving immediately before the collision, and Urban's testimony, the Court concluded Weston was in fact moving at the time of impact, as Zurich should have.  Additionally, the accident photos indicate damage on the front corner of the driver's side of the van, making it conceivable that Weston turned left into Urban as Urban was riding through the intersection.  As Urban described, the van "suddenly" made a left turn into the motorcycle" as Urban attempted to veer towards the right southbound lane to avoid the collision.  Accordingly, in executing the left turn Weston had the duty of care,

and Urban had the right-of-way as a part of the oncoming traffic.  See Miller v. United States,

196 F. Supp. 613 (D. Mass. 1961) (holding both drivers were negligent; the driver of the car was

negligent in attempting to make a left-hand turn at street intersection when the government

vehicle was too close).  Weston violated that duty, and in turn violated Chapter 89, right-of-way

statute.

>        iii.      **Speeding and Weaving Between Lanes**

Violation of the right-of-way is just one factor in liability, so the Court now considers the

duty of care imposed by M.G.L. c. 90, § 17, mandating that motor vehicles be operated at a

reasonable speed.  The statute in part provides:

> No person operating a motor vehicle on any way shall run it at a rate
> of speed greater than is reasonable and proper, having regard to
> traffic and the use of the way and the safety of the public . . . . If a
> speed limit has been duly established upon any way, . . . operation
> of a motor vehicle at a rate of speed in excess of such limit shall be
> prima facie evidence that such speed is greater than is reasonable
> and proper; but, notwithstanding such establishment of a speed
> limit, every person operating a motor vehicle shall decrease the
> speed of the same when a special hazard exists with respect to
> pedestrians or other traffic, or by reason of weather or highway
> conditions.

Traffic, road conditions, and other relevant circumstances must be considered when determining

if the operator of a vehicle is traveling at a reasonable speed.  See Conrad v. Mazman, 287 Mass.

229, 235 (1934) (holding that almost any speed can be considered unreasonable in certain

circumstances, such as lack of attention to the road ahead);  see also Natick Police Dep't v.

Labutti, 897 N.E.2d 619 (2008) (finding that defendant's speed, which was within the posted

speed limit, as she approached and continued through a marked construction zone that included

lane changes and where other vehicles were proceeding at a slower rate, was not reasonable and

proper).

Based on the evidence, the Court determined that Urban's speed was roughly 30 mph while operating his motorcycle in heavy traffic conditions.  While his speed was within the speed limit, it was unreasonable for the traffic conditions.  Accordingly, Urban violated Chapter 90 for exceeding a speed that accounted for the heavy traffic.  Urban's unreasonable speed however did not completely negate or shift the right-of-way, nor did it vacate Weston's duty of care required when making a left turn.  See Gray, 194 N.E. 817; see also Preston v. Raia, 2008 Mass. App. Div. 280 (Dist. Ct. 2008) (holding that a driver, despite having the right of way, breached his duty of care by focusing on making the light rather than yielding to the second driver); Anthony v. Jancsics, 2001 Mass. App. Div. 137 (Dist. Ct. 2001).  While Urban's speed exceeded an appropriate speed, he was operating within the speed limit and did not achieve an outrageous speed (like 70 or 80 mph) that would likely prevent Weston from seeing or anticipating Urban traveling through the intersection, (if Weston was looking at oncoming traffic).

Briefly, with respect to Urban's other alleged reckless behavior, as of mid-May of 2018, following Richards' and Weston's deposition testimony, it was clear that there was insufficient evidence to support that Urban was weaving in between cars or creating his own lane.  Accordingly, the record does not support that Urban violated any lane violation statute such as M.G.L. c. 89, § 4A.

### iv.    Comparative Negligence

Zurich's liability analysis relied upon Urban's comparative negligence and its belief that any comparative negligence prevents liability from being reasonably clear.  While comparative negligence can, in some cases, prevent liability from becoming reasonably clear, insurance companies cannot avoid its obligation to make a reasonable offer by hiding behind the gamesmanship of anticipated success at trial.  See Rhodes v. AIG Domestic Claims, Inc., 24

Mass. L. Rep. 142 (2008).  In fact, determining whether liability is reasonably clear is "independent" from how a jury may perceive motorcyclists or Urban's actions.  See McLaughlin, 55 N.E.3d at 1015 ("when an insured's liability became reasonably clear is based on an objective assessment of the facts known or available at the time and is independent of how a jury in a separate trial views the insured's liability.").

The First Circuit recently affirmed a district court decision that rejected the blanket argument that liability was not reasonably clear due to plaintiff's contributory negligence.  See Higgins II, 953 F.3d at 104, 109-110. The matter concerned an underaged employee who was provided drinks by employees of age, while working her shift at a nightclub.  Id. at 98.  After a night of drinking, a bouncer escorted plaintiff to her car, she drove off and got in a catastrophic car accident.  Id. Defendants argued that due to her comparative negligence, by driving the vehicle while intoxicated, liability could not be determined.  Capitol Specialty Ins. Corp. v. Higgins, 375 F. Supp. 3d 124, 134 (D. Mass. 2019) ("Higgins III"), aff'd in part, rev'd in part and remanded, 953 F.3d 95 (1st Cir. 2020) (reversed on other grounds).  The district court rejected this argument, stating the establishment was aware that the plaintiff was underage and served her anyway.  Id.

Another court in this district has also held that "[a]n insurer is 'not required to put a fair and reasonable offer on the table until liability and damages [are] apparent' or if 'there exist[s] a legitimate difference of opinion as to the extent' of liability."  Scott, 2011 WL 4436984, at *8 quoting (Bobick v. U.S. Fid. & Guar. Co., 790 N.E.2d 653, 659– 660 (2003) ("Bobick II")).  The plaintiff in Scott fell off the roof after leaning on a corroded railing.  At issue was plaintiff's comparative negligence due to medical records suggesting plaintiff was intoxicated when he fell off the roof, and whether liability ever became reasonably clear.  There were no witnesses to

plaintiff's fall and serious concerns with the lack of clarity of plaintiff's account of the incident, along with credibility issues. Scott, 2011 WL 4436984, at *1. More importantly, the law around implied warranty of habitability was unsettled, making it nearly impossible to predict applicability of the law to Scott's circumstances. Id. at *9 (D. Mass. Sept. 22, 2011).

Here, there is no question as to the applicability or interpretation of Chapter 89, § 8, regarding right-of-way. The standard of "reasonably clear" must not be conflated to mean absolutely certain as to all the details and specific comparative percentages, especially where the tortfeasor's fault is substantial. The Court disagrees with Zurich's contention that damages are indeterminable here once it is established that Weston was moving at the time of impact. There was sufficient evidence to support the conclusion that Weston violated his duty of care and should be attributed the majority of fault.

The cases Zurich cites discussing that when comparative negligence is disputed, and "a party's proportionate share is indeterminate" then liability is not clear, are not persuasive here. These cases concern circumstances where there are multiple tortfeasors or when damages are in dispute. See e.g., Bobick II, 790 N.E.2d at 660 (rejecting plaintiff's "argument that the doctrine of joint liability" allowed him to recover damages from any or all tortfeasors where there were multiple parties, several employees and a number of insurers involved); Ingalls v. Minnesota Laws. Mut. Ins. Co., No. CIV.A. 12-11057-GAO, 2013 WL 3943537, at *2 (D. Mass. July 29, 2013) (discussing that damages were never reasonably clear, and that plaintiff estimated damages without specification); Hache, WL 9743750, at *23, report and recommendation adopted, No. CV 20-10652, 2023 WL 8720051 (D. Mass. Dec. 18, 2023) (discussing that liability was not reasonably clear where plaintiff appeared to concede that damages were unclear). That is not the case here. There was one van that ran into the motorcycle while

making a left turn into a busy intersection.  Additionally, Zurich did not dispute the damages in the underlying trial.

Zurich also cites to cases where courts found there was a genuine and legitimate dispute of fact as to comparative negligence, and therefore liability was not reasonably clear. See McMillan v. Westport Ins. Corp., No. CIV.A. 03-6107H, 2004 WL 3106733, at *3 (Mass. Super. Dec. 10, 2004) (discussing there was a genuine dispute and issue of comparative negligence where plaintiff's erroneous information was the cause of the elapsed statute of limitation).  In many of these cases, genuine disputes are based on more than a hunch or gamesmanship, like the matter here, where the insurer was focused on defensive posturing rather than properly conducting a neutral evaluation of fault.  For example, in some of these cases, experts were actually retained to provide competing expert opinions about the genuine issues in dispute.  See e.g., Hache, 2023 WL 9743750, at *24 (discussing there was a material dispute of fact as to damages presented by defense's expert neuropsychologist and plaintiff's medical records); O'Leary-Alison, 752 N.E.2d at 798 (discussing there was a genuine dispute as to damages because the independent medical examiner found no physical condition warranting treatment).  As stated above, a reasonable investigation was not conducted, which would have aided Zurich in fair evaluation of comparative negligence.

The various percentages in comparative negligence included in Zurich's reports are not a reflection of liability, but rather guess-work and gamesmanship in determining the probability of success before a jury.  Assessing comparative liability is a separate function from determining liability.  See McLaughlin, 55 N.E.3d at 1015.  Even so, Zurich predicted and reflected in its comparative percentages that, should Weston be found in violation of the right-of-way statute, a jury would likely find for the plaintiff.   In other words, Zurich anticipated that if Weston was

found in violation of the right-of-way statute, "a reasonable person, with knowledge of the relevant facts and law, would probably have concluded, for good reason, that the insure[d] was liable to the plaintiff." See McKinnon, 516 F. Supp. 3d at 64. This certainly should have been the case upon completion of the depositions and discovery by June of 2018. At this point, liability was reasonably clear.

### C.  Chapter 93A Safe Harbor Provision

Zurich again seeks the protection of the Safe Harbor Provision, should the Court find its offers to be unreasonable. M.G.L. c. 176D, § 3(9)(g) prohibits insurers from compelling insureds to institute litigation by offering substantially less than the amounts ultimately recovered. Through this provision the legislature intended to penalize "low balling" an insured "where liability is either clear or highly likely." R.W. Granger, 754 N.E.2d at 678. On the other hand, Section 9(3) of Chapter 93A provides that if a recipient of a demand letter timely tenders a written settlement offer and, if that offer is rejected, the recipient may "limit damages" where "the court finds that the relief tendered was reasonable in relation to the injury actually suffered by the petitioner." The plain language of the statute does not indicate or require that courts use a particular formula for the "injury actually suffered." Id. As the Court has stated before, there is no clear indication that the meaning of "injury actually suffered" is meant to carry the same meaning as the "actual damages" provision for determining damages for Chapter 176D violations. See Urb. v. Zurich Am. Ins. Co., No. 21-CV-11182-AK, 2024 WL 3011234, at *4 (D. Mass. June 14, 2024).

Assuming the safe harbor provision applies to unfair conduct under Chapters 176D and 93A, a plain reading of the phrase "injury actually suffered" suggests that it can account for various forms of injury—such as any injury resulting from being forced to litigate—so long as it

was an "injury actually suffered."  See Higgins II, 953 F.3d 95 at 110 (discussing other injuries

available besides the loss of use formula with respect to single damages for Chapter 176D

violations).  The only restriction that Section 9(3) appears to have regarding the safe harbor

provision and available damages is the protection against punitive damages.  See M.G.L. c. 93A

§ 9(3).

  **i. Reasonable Offer**

  Now that the Court has determined liability was reasonably clear by June of 2018, Zurich

has the burden of satisfying the first step of invoking the safe harbor provision—proving the

offer was reasonable.  Hopkins, 750 N.E.2d at 953.  "The reasonableness of an insurer's response

is to be considered in the light of the situation as a whole."  Bobick II, 790 N.E.2d at 660.  "In

assessing the adequacy of a settlement offer, we must determine whether, in the circumstances,

and in light of the complainant's demands, the offer [was] reasonable, judged at the time it was

made.  Even a serious undervaluation of a claim may not render an insurer liable without

evidence that the insurer acted deliberately to derail the settlement process."  McDade v. Benoit,

103 Mass. App. Ct. 1112, 222 N.E.3d 505, *3 (2023) (cleaned up).  Reasonableness can be

measured by looking to the undisputed evidence indicating the damages suffered against the

offer tendered.  See Terry, 195 N.E.3d at 454 (discussing defendants' failure to make a

"reasonable settlement offer based on what the uncontroverted objective evidence showed the

damages to be").  Another relevant factor to consider is "the passage of time between the initial

estimate and final award, and the nature of the damage."  River Farm Realty Tr. v. Farm Fam.

Cas. Ins. Co., 943 F.3d 27, 40 (1st Cir. 2019).  Judgments in underlying cases can also be

considered in terms of the "disparity in amounts offered and amount awarded . . . but [it] cannot

be subject to per se rules and depends on the totality of the facts."  River Farm Realty, 943 F.3d

at 39; see Bobick II, 790 N.E.2d at 660 (evaluating the disparity between the initial estimate and the amount awarded by the jury and determining that the difference was "not substantial[]," and there was no other evidence that the first estimate was unreasonable). The Supreme Judicial Court has made clear that the jury verdict, "may not constitute in all circumstances a definitive measure of reasonableness." Bobick II, 790 N.E.2d at 660.

In evaluating an offer, courts must consider that "[t]he statute . . . does not call for [a] defendant's final offer, but only one within the scope of reasonableness." Forcucci v. U.S. Fid. & Guar. Co., 11 F.3d 1, 2 (1st Cir. 1993). Experienced negotiators do not open legitimate settlement discussions with their final offer and likewise, experienced negotiators do not expect it. Id.

On February 23, 2017, Urban made an offer of $100,000 and an offer of $125,000 on July 20, 2017. At that time, liability was not reasonably clear, as the depositions had not taken place. On October 22, 2018, Zurich tendered an offer of $200,000 in mediation. By June 2018 all depositions and discovery had concluded, and Zurich had received Alvino's report. Liability was reasonably clear prior to making this offer. Accordingly, the October 22 offer is the first relevant offer the Court assesses to determine whether it was reasonable. See M.G.L. c. 176D, § 3(9)(f) (discussing there is only a duty to make an offer when liability becomes clear).

Zurich estimated this case to be worth $1,006,500 in 2017. Zurich was also aware that Urban accrued over $300,000 in medical bills. In light of these numbers, $200,000 as the final offer following mediation—a value $100,000 short of covering Urban's medical bills four years after the accident—was unreasonable. Furthermore, a panel of three judges, awarded Urban roughly around $1,420,679.13 (including interest), which was in line with Zurich's prediction of the value of the case. While the judgment is not a definitive factor of reasonability, it may be

considered.  See Bobick II, 790 N.E.2d at 660.  The proximity of the award amount and Zurich's valuation of the case suggests that the judgment was not an unforeseen, outlandish amount. Rather a reasonable inference is that Zurich was aware of the true value of the claim, but let its gamesmanship interfere with carrying out its duty to make a fair and reasonable offer.  Given these facts, Zurich's offer of $200,000 was unreasonable.

On Friday, April 2, 2021, following the underlying state trial and Urban's Chapter 93A demand letter, Zurich offered $70,000 to settle the matter.  According to Zurich, this value assumed that a $500,000 offer could have settled the case in October 2018 and then applied a 6% interest rate to that settlement amount through the date of the April 2, 2021 letter.  This April 2, 2021 offer is inadequate based on the reasons below.

**D.  Damages**

Damages resulting from a violation of Chapter 176D and 93A vary depending on a defendant's conduct.  Following an amendment of the statute in 1989, the statute specified that if the conduct was wilful or knowing, "actual damages" was to be "the amount of the judgment on all claims arising out of the same and underlying transaction or occurrence."  R.W. Granger, 754 N.E.2d at 680 (quoting M.G.L c. 93A).  This amendment was intended to ensure that in cases where the punitive multiplication of damages is appropriate, both the accrued interest of the judgment as well as the judgment itself, collectively are multiplied.  Cohen v. Liberty Mut. Ins. Co., 41 Mass. App. Ct. 748, 755, 673 N.E.2d 84, 89 (1996); see also Rhodes v. AIG Domestic Claims, Inc., 461 Mass. 486, 500, 961 N.E.2d 1067, 1079 (2012) ("[I]t is clearly the case that if knowing or wilful prejudgment conduct causes injury, the proper measure of damages would be the underlying tort judgment."); R.W. Granger, 754 N.E.2d at 683 (prejudgment interest forms part of underlying judgment and therefore is multiplied in computing award under G. L. c. 93A).

"A person acts knowingly with respect to a result if he is aware that it is practically certain that his conduct will cause such a result." Gore, 932 N.E.2d at 850 (quoting Computer Sys. Eng'g, Inc. v. Qantel Corp., 571 F. Supp. 1365, 1374 (D. Mass. 1983) (internal quotation omitted)). A court need not make a "finding that a person wilfully or knowingly violated G.L. c. 93A, § 2, as long as the evidence warrants a finding of either." Id. (quoting Serv. Publications, Inc. v. Goverman, 396 Mass. 567, 578, 487 N.E.2d 520, 527 n. 13 (1986)) (internal quotations omitted). An insurer acts knowingly or wilfully when it engages in intentional misconduct, has made knowing misrepresentations, or has acted with "studied indifference" to a claimant's rights. Miller v. Risk Mgmt. Found., 36 Mass. App. Ct. 411, 420, 632 N.E.2d 841, 846 (1994) (insurer acted "with knowledge or reason to know of its [legal] violation"); Kapp v. Arbella Mut. Ins. Co., 426 Mass. 683, 687, 689 N.E.2d 1347, 1349 (1998) (insurer acted intentionally and "made misrepresentations. . .it knew to be false."). Courts have found punitive damages appropriate where insurance companies "had reason to know of its liability," yet failed to settle the claim for more than a year thereafter. Cohen, 673 N.E.2d at 90 (trebling the underlying judgment).

Zurich wilfully and knowingly waged an unreasonable investigation, which if it had been conducted properly or with a modicum of objectivity earlier, in evaluating liability and comparative negligence, this case would have resolved far sooner. This matter needlessly dragged out for a number of years with the hope that a jury's perception of young motorcyclists would be considered more than the evidence. The Court finds Zurich's actions warrant an award of double damages. The underlying court awarded Urban $962,049.79 with $458,629.34 of interest, totaling $1,420,679.13. The underlying judgment plus the prejudgment interest in the underlying matter is doubled because "it compensates the prevailing party for the time value of money accrued before resolution of the legal dispute, and thus represents an 'integral component

of compensatory damages.'" <u>Anderson v. Nat'l Union Fire Ins. Co. of Pittsburgh PA</u>, 67 N.E.3d 1232, 1238 (2017) quoting <u>Smith v. Massachusetts Bay Transp. Auth.</u>, 968 N.E.2d 884, 890 (2012); <u>see also</u> <u>R.W. Granger & Sons, Inc.</u>, 754 N.E.2d at 681-683 (punitive damages double the amount of the underlying judgment for wilful and knowing violation; prejudgment interest forms part of the underlying judgment and is multiplied under G. L. c. 93A).

### E.  ORDER

For the foregoing reasons, Urban is awarded $2,841,358.26, plus attorneys' fees.


**SO ORDERED**                                   <u>/s/  ANGEL KELLEY</u>
                                                 Hon. Angel Kelley
Dated: September 30, 2024                         United States Dist. Judge