**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| JUSTIN URBAN,<br><br>Plaintiff,<br><br>v.<br><br>ZURICH AMERICAN INSURANCE COMPANY,<br><br>Defendant. | ) | Civil Action No. 21-CV-11182-AK |

**MEMORANDUM AND ORDER**

**ANGEL KELLEY, D.J.**

On October 28, 2026, the First Circuit remanded this action, explaining that the Court's September 30, 2024, Findings of Fact, Rulings of Law, and Order for Judgment [Dkt. 162] "concluded that Zurich's 93A settlement was unreasonable" but "omitted its reasoning regarding this fact-intensive issue." [Dkt. 189 at 2]. The First Circuit remanded "for the limited purpose of providing an explanation in the first instance of whether, in fact, Zurich's $70,000 settlement offer was reasonable in relation to the loss-of-use injury Urban had alleged, and why." [Id.]. The Court inadvertently omitted its analysis and addresses the issue on remand here.

At trial, Zurich bore the burden of showing that its $70,000 offer was reasonable in relation to the "injury actually suffered" by Urban, namely, injury from loss of use.[1] See Kohl v.

[1] In its remand order, the First Circuit held that the only injury Urban adequately alleged as a result of the Chapter 176D violation was the loss of use of money wrongfully withheld. [Dkt. 189 at 1-2]. The Court therefore understands the remand order to exclude from the reasonableness inquiry any additional injuries Urban may have suffered but did not adequately allege in his demand letter, such as "emotional distress damages," "damages from fear of financial ruin," "suffer[ing] the costs and frustrations of litigation," "being forced to litigate to receive benefits," "emotional distress due to unpaid medical bills," "damages for intentional

Silver Lake Motors, 343 N.E.2d 375, 378 (Mass. 1976). That injury is calculated based on three inputs: (1) when Zurich's obligation to make a reasonable settlement offer arose; (2) the amount Zurich wrongfully withheld; and (3) the applicable interest rate. See Calandro v. Sedgwick Claims Mgmt. Servs., 264 F. Supp. 3d 321, 324 (D. Mass. 2017) (quoting Clegg v. Butler, 676 N.E.2d 1134, 1142 (Mass. 1997)). Zurich contended that its $70,000 offer was based on a 6% interest rate on a hypothetical $500,000 settlement offer it should have made to Urban during an October 2018 mediation session. As explained below, Zurich failed to meet its burden of showing that the selected date (October 2018) and amount ($500,000) were reasonable. As a result, its $70,000 calculation was unreasonably low in light of the injury Urban actually suffered.

## I. Date of Offer

First, Zurich argued that it reasonably selected October 2018 as the date from which interest would have accrued. According to Zurich, the parties engaged in a second mediation session on this date and it thus formed a reasonable reference point for when "the claim should have been paid." Rhodes v. AIG Domestic Claims, Inc., 961 N.E.2d 1067, 1077 (Mass. 2012).

Zurich failed to demonstrate that October 2018 is the appropriate date from which to measure Urban's loss-of-use damages. Instead, as the Court explained in its prior Order, the record established that Zurich's liability in the underlying tort action became reasonably clear

---

infliction of emotional distress," and other "losses which were the foreseeable consequence of . . . unfair or deceptive conduct." [Dkt. 135 at 7 (quoting Capitol Specialty Ins. Corp. v. Higgins, 953 F.3d 95, 110 (1st Cir. 2020); Rhodes v. AIG Domestic Claims, Inc., 961 N.E.2d 1067, 1078 n.20 (Mass. 2012); Chery v. Metro. Prop. & Cas. Ins. Co., 948 N.E.2d 1278, 1280-81 (Mass. 2011); Haddad v. Gonzalez, 576 N.E.2d 658, 667-68 (Mass. 1991); Cohen v. Liberty Mut. Ins. Co., 673 N.E.2d 84, 89 (Mass. 1996)); see also Dkt. 162 at 37-38]. The Court accordingly addresses the issue on remand within that constraint, notwithstanding its prior conclusion that such damages could be considered. [See Dkts. 135 at 7-20; 82; 162 at 37-38].

four months earlier in June 2018, following the close of discovery. [See Dkt. 162 at 37]. At that point, Zurich's statutory duty under Chapter 176D to effectuate a prompt, fair, and equitable settlement arose.[2] See Calandro v. Sedgwick Claims Mgmt. Servs., Inc., 919 F.3d 26 (1st Cir. 2019) (affirming district court's decision to "evaluat[e] the reasonableness and promptness of [defendant's] settlement offers" based on the date on which "liability had become reasonably clear"); Boyle v. Zurich Am. Ins. Co., No. MICV2011-02244, 2014 WL 4082302, at *13 (Mass. Super. June 23, 2014) (explaining that "Zurich therefore had a duty 'to settle the case'" once "Zurich had already determined that [the insured's] liability was reasonably clear"), vacated on other grounds, 36 N.E.3d 1229 (Mass. 2015); Cohen v. Liberty Mut. Ins. Co., 673 N.E.2d 84, 89 (Mass. 1996). Zurich raised no arguments or evidence suggesting that it was prevented from engaging in good-faith settlement discussions by June 2018 before the mediation. By that time, nearly four years had already elapsed since the accident, compounding the harm to Urban by further delay.

In response, Zurich advances two arguments against using June 2018 as the operative date. First, Zurich contends that selecting June 2018 relies improperly on hindsight because when Zurich first received Urban's Chapter 176D demand letter, it did not have the benefit of the Court's later determination that liability became reasonably clear in June 2018. Second, Zurich argues that the four-month interval between June 2018 and October 2018 represents a reasonable

[2] Zurich raised no compelling reason why the safe-harbor analysis under Chapter 93A, which is premised on a Chapter 176D violation, should employ a different accrual date than the analysis under Chapter 176D. Indeed, this approach is consistent with how Massachusetts courts calculated loss-of-use damages under Chapter 93A § 9(3) before the 1989 amendments. See Bertassi v. Allstate Ins. Co., 522 N.E.2d 949, 953 (Mass. 1988) (instructing lower court to calculate interest from "the time that [the award] should have been paid" by making finding as to "when [the defendant's] liability to pay . . . was reasonably clear"). And at least one court has used an even earlier date—"the date the underlying tort claim was filed." Gretzky v. AmGUARD Ins. Co., No. 25-CV-10267, 2025 WL 3140762, at *2 (D. Mass. Nov. 10, 2025).

and minimal delay between the close of discovery and the presentation of a settlement offer.

As an initial matter, Zurich did not raise these arguments before, during, or after trial, and instead raised them for the first time in its supplemental briefing following remand. Because these arguments were not before the Court when it issued its September 30, 2024, Order, and the First Circuit's remand directs the Court to articulate the basis for that decision as it was made, the Court declines to give retrospective effect to arguments first raised after the fact. Cf. Marks 3 Zet-Ernst Marks GmBh & Co. v. Presstek, Inc., 455 F.3d 7, 16 (1st Cir. 2006) (explaining that a party may not bring new arguments in a motion for reconsideration that could have been presented prior).

In any event, should the Circuit expect consideration of Zurich's arguments on the merits, the Court finds that neither is persuasive. As to Zurich's argument regarding hindsight, the Court's determination was an objective assessment of when a reasonable insurer in Zurich's position, evaluating the evidence then available, should have recognized that liability was clear. By June 2018, discovery had closed and the evidentiary record overwhelmingly established that the insured, Keith Weston, was liable for Urban's injury. [See Dkt. 162 at 37]. Zurich therefore should have known at that time both that it faced liability and that it had a corresponding duty to pursue settlement. It did not need a court order to make that clear.

As to Zurich's argument that the delay was minimal, Zurich principally relies on Rhodes v. AIG Domestic Claims, Inc., 961 N.E.2d 1067 (Mass. 2012), where the Massachusetts Supreme Judicial Court affirmed the lower court's determination that an insurer acted reasonably by tendering its policy limits approximately two months after liability became reasonably clear. See id. at 1082. However, there, the trial court explained that the delay was reasonable under the circumstances, noting that the insurer was required to prepare a detailed report, obtain multiple

levels of internal approval before settlement, and encountered significant delays from turnover of senior personnel responsible for approvals. See Rhodes v. AIG Domestic Claims, Inc., No. 05-1360, 2008 WL 2357015, at *19-20 (Mass. Super. June 3, 2008), aff'd as modified, 937 N.E.2d 471 (Mass. App. Ct. 2010), aff'd, 961 N.E.2d 1067. The court further noted that some delay was inevitable because the approval process occurred during the holiday season (i.e., over Thanksgiving and New Year's from November 2003 to January 2004). Id.

In short, Rhodes involved only a two-month delay and, importantly, the court relied on multiple explanations for that delay. Here, Zurich offers no explanation at all for a delay that was twice as long, despite bearing the burden of demonstrating the reasonableness of its offer. Zurich provides no evidence regarding, for example, its timeline for internal settlement-approval procedures, any extenuating circumstances like staff turnover or operational disruptions, nor did the negotiations occur over a holiday period. Absent such evidence, the Court cannot conclude that a four-month delay was reasonable, particularly as any argument that the delay was "minimal" reflects only Zurich's perspective and largely ignores the obvious prejudice to Urban. On the present record, Zurich has articulated no persuasive basis for postponing settlement efforts from June 2018 to October 2018 other than its own lackadaisical and dilatory conduct.

Accordingly, Zurich failed to establish that October 2018 provides a reasonable date from which to calculate Urban's loss-of-use damages. Instead, the date on which Zurich should have fairly and promptly settled the case was in June 2018. Because Zurich did not satisfy the underlying judgment until April 2021, Urban was deprived of the use of those funds for approximately 34 months.

## II. Amount Wrongfully Withheld

Zurich next argued that it reasonably calculated its $70,000 settlement offer based on a

hypothetical $500,000 settlement offer that it should have extended at the October 2018 mediation. Zurich, however, again failed to carry its burden of demonstrating that this figure represents a reasonable settlement amount, particularly as Zurich's highest offer that it actually made was $300,000. On the record before the Court, a reasonable settlement amount would have been approximately $1 million. This amount is consistent with the underlying award, Zurich's policy limit, Zurich's internal valuations of the claim, and the evidence before Zurich that demonstrated Weston's fault and the extent of Urban's injuries.

Money wrongfully withheld for purposes of the Chapter 93A safe harbor analysis consists of "money that should have been, but was not, offered" by the insurer to the plaintiff. Hopkins v. Liberty Mut. Ins. Co., 750 N.E.2d 943, 952 (Mass. 2001). Courts have generally used the underlying judgment as the reference point where available because defendants have historically structured safe-harbor offers around interest on that judgment. See, e.g., Calandro, 264 F. Supp. 3d at 322 (comparing safe-harbor offer to interest on $1.4M compensatory award); Wahlstrom v. Zurich Am. Ins. Co., No. 19-CV-12208, 2022 WL 20416910, at *6-7 (D. Mass. Nov. 22, 2022) (same for interest on $4 million jury verdict plus costs and interest); Gretzky v. AmGUARD Ins. Co., No. 25-CV-10267, 2025 WL 3140762, at *3 (D. Mass. Nov. 10, 2025).

In addition to an underlying judgment, courts also consider any applicable insurance policy limits that might cap liability, see Gretzky, 2025 WL 3140762, at *3; Boyle v. Zurich Am. Ins. Co., No. MICV2011-02244, 2013 WL 3341059, at *5 (Mass. Super. Apr. 12, 2013), on reconsideration, No. MICV2011-02244, 2013 WL 5317451 (Mass. Super. Sep. 24, 2013); Cohen, 673 N.E.2d at 89, the defendant's own valuation of a case, and any record evidence supporting or discounting such a valuation, see Martinez-Rivera v. Com. Ins. Co., No. HDCV200600749, 2011 WL 3276684, at *8 (Mass. Super. Apr. 11, 2011) (using defendant's

high-end estimate of value of case because the low-end estimate was "based on [the defendant's] determination that [the plaintiff's] degenerative disc disease was not aggravated by the accident," which was a "determination [the defendant] was not only unqualified to make but steadfast in his refusal to investigate").

Applying those principles here, a reasonable offer would have been Zurich's policy limit of $1 million. [See Dkt. 162 ¶ 17]. Zurich was aware by at least November 2016, when it received Urban's demand letter, that the underlying claim involved serious and debilitating personal injuries. [See id. at 1-2, 4 ¶ 22]. Urban's submissions included a medical report explaining that he had sustained fractures from his pelvis to his legs, ankles, and feet, as well as injuries to his organs, joints, and muscles. [Id.]. Zurich also knew that Urban had been hospitalized for 26 days following the September 2014 accident, had undergone multiple surgeries and medical procedures, and incurred more than $300,000 in medical expenses as well as lost wages. [Id.]. Indeed, at trial, Urban established that he was 22 years old at the time of the accident and, as a result of his injuries, was assessed by a physician as facing a 55-year life expectancy with 45% whole-person impairment, including permanent loss of function in his arms. [Dkt. 154 at 162-63].

The magnitude of Urban's damages was further confirmed by the ultimate judgment of the underlying action. The three-judge panel awarded Urban approximately $1 million in damages, exclusive of more than $450,000 in prejudgment interest—reflecting a finding of 90% fault by Weston. [Dkt. 162 ¶¶ 152-53]. At the time Zurich made its $70,000 settlement offer, Zurich clearly knew both the amount of the award and how fault had been allocated among the parties. [Id. ¶¶ 152-56]. The award was also consistent with Zurich's own internal evaluations of

the case from 2017, which estimated the value to be over $1 million.[3] [Id. at 39]. Urban, likewise, consistently demanded amounts in the range of approximately $900,000 to $1.5 million.[4] [Id. ¶¶ 22, 149-50]; cf. River Farm Realty Tr. v. Farm Fam. Cas. Ins. Co., 943 F.3d 27, 38-39 (1st Cir. 2019) (explaining that a claimant's demands can be "considered as part of the over-all circumstances affecting the amount that would qualify as a reasonable offer in response" (quoting Bobick v. U.S. Fid. & Guar. Co., 790 N.E.2d 653, 660-61 (Mass. 2003))).

In light of the severity and permanence of Urban's injuries, the evidence concerning his economic losses, Zurich's own assessment of the claim's value, and the ultimate award entered in the underlying tort action, the record established that the claim's value met or exceeded Zurich's $1 million policy limit. Because Zurich knew or should have known that Weston was primarily responsible for the accident, a reasonable settlement offer would have reflected that full amount.

Zurich argued that $500,000 is reasonable because it accounted for then-existing uncertainty regarding damages and fault allocation. However, this argument relies on an assumption that, in June 2018, the evidence available to the parties suggested that Urban was

---

[3] To the extent Zurich argued that consideration of its internal claim valuations is improper because such assessments are protected work product, the Court does not address the issue because it is insufficiently developed. See United States v. Espinal-Almeida, 699 F.3d 588, 615 n.27 (1st Cir. 2012) (declining to address argument supported by "[n]o analysis or legal citations").

[4] Zurich noted that, in May 2018, Urban's attorney estimated the value of the case at between $500,000 and $900,000, and, in February 2021, extended a $500,000 settlement demand before withdrawing it approximately one week later. [Dkts. 42-1 ¶ 9; 162 ¶ 151]. It also highlighted that the mediator at the October 2018 conference valued the case at $500,000. [Dkt. 158 ¶ 95]. Those facts are relevant but not dispositive because the 2018 positions preceded Zurich's disclosure that it maintained an excess insurance policy [Dkt. 162 at 4 n.2], and the 2021 offer followed three additional years of litigation. [See Dkt. 154 at 208 (trial testimony by claims evaluator explaining that "[a]s time goes on and the insurance company wears the plaintiff down, the demand drops")].

approximately 50% at fault for the accident. But as the Court explained at length in its September 30, 2024, Order, Zurich pointed to no credible evidence that would have supported such a conclusion. [See 162 at 33-37 (rejecting Zurich's arguments that comparative negligence was reasonably in dispute, instead concluding that Zurich's reports constituted "guess-work and gamesmanship in determining the probability of success before a jury")]. Zurich had the duty to reasonably investigate and make a prompt settlement offer, which it did not do. See Hopkins, 750 N.E.2d at 952.

Again, the evidence available to Zurich at that time overwhelmingly favored a finding that Weston was primarily responsible for the accident. In November 2016, Urban provided Zurich with a collision analysis report prepared by Kerry Alvino, the former Massachusetts State Police Lieutenant retained by Urban as an expert, which concluded that Weston failed to observe oncoming traffic and encroached upon Urban's right-of-way. [Dkt. 162 ¶¶ 22, 36]. Zurich also had deposition testimony from Ann Marie Richards, an eyewitness, stating that Weston was accelerating at the time of the collision. [Id. ¶¶ 39-40]. By contrast, Zurich had not obtained an accident reconstruction expert report of its own to dispute Alvino's report, despite having had four years to investigate the claim. [See id. ¶ 107]. Zurich also had no eyewitness testimony corroborating its theory that Weston had come to a complete stop before entering the roadway or that Urban had been weaving, nor did Zurich retain an expert to review photographs or physical evidence from the collision. [See id. ¶¶ 54, 56]. The sole potential eyewitness they identified who would testify that Weston was stopped ultimately declined to participate. [Id. ¶ 125].

Instead, Zurich largely relied on Weston's own account—as well as a report prepared by an adjusting professional, the police report from the accident, and internal reports from Zurich's attorney and internal claims specialist, all of which drew primarily from Weston's testimony—

despite significant concerns bearing on his credibility. [See, e.g., id. ¶¶ 18, 38, 55, 63]. This includes inconsistencies in his testimony regarding the circumstances of the collision, his admissions that he did not see Urban before the collision and therefore lacked a basis to testify as to whether Urban had been weaving, and his history of prior traffic accidents. [Id. ¶¶ 70, 137]. Zurich also relied on considerations that bore little relationship to the available evidence concerning fault, such as a belief that a jury might view Urban less favorably because he is a young, male motorcyclist, and because he was allegedly a recovering heroin addict—information which was later shown to be entirely false. [Id. ¶¶ 111, 115, 118, 126]. Neither consideration provided evidence that Urban negligently caused or contributed to the accident. Finally, Zurich relied on Richards' testimony that Urban had been traveling approximately 30 miles per hour as he approached the intersection. [See id. ¶¶ 80, 83]. However, as the Court previously explained, Urban's speed did not put comparative fault materially in dispute. [Id. at 33].

Thus, by June 2018, the discovery record overwhelmingly established that Weston bore primary responsibility for the accident. There was no reasonable factual dispute concerning liability, no unresolved coverage issues, and no ongoing investigation that could explain a continuing lack of clarity. Chapter 176D requires that insurers evaluate available evidence fairly and objectively. Here, the record demonstrated that Zurich consistently discounted evidence unfavorable to its position while assigning substantial weight to speculative or unsupported theories of comparative negligence. That approach was reflected in Zurich's settlement conduct throughout the underlying litigation, including a series of offers between $100,000 and $300,000, which was substantially below both its own internal valuation of the claim and the ultimate award returned by the panel. [Id. ¶¶ 146-51]. Zurich's proposed $500,000 hypothetical settlement value continued to be predicated on a speculative level of potential comparative fault

that the record did not reasonably support. Accordingly, a reasonable settlement offer would have been approximately $1 million.

## III. Interest Rate

Finally, Zurich argued that its use of a 6% interest was "fair" for purposes of the loss-of-use calculus, and the Court agrees. Wahlstrom, 2022 WL 24016910, at *7 ("The loss of use calculus requires only the use of a 'fair rate' of interest, rather than any particular interest rate."). In Rivera v. Commerce Insurance Co., 993 N.E.2d 1208 (Mass. 2013), the Massachusetts Supreme Judicial Court stated that "[o]ur canvassing of the case law reveals various interest rates used by factfinders ranging from five to twelve percent."[5] Id. at 1211 n.10. Zurich's use of a 6% interest rate falls between 5% to 12% and therefore was reasonable.

## IV. Calculation

Having determined the relevant inputs, the Court turns to the calculation of Urban's loss-of-use damages. As explained above, Zurich should have extended a settlement offer of at least $1 million by June 2018. Applying a 6% annual interest rate over 34 months (i.e., June 2018 to April 2021), Urban's loss-of-use damages total approximately $170,000, or nearly 2.5 times Zurich's $70,000 offer.[6] Thus, Zurich's settlement offer was unreasonable.

---

[5] The Court applies the state, not federal, interest rate because "federal courts sitting in diversity apply state substantive law and federal procedural law,'" Suero-Algarin v. CMT Hosp. Hima San Pablo Caguas, 957 F.3d 30, 39 (1st Cir. 2020) (quoting Gasperini v. Ctr. for Humanities, Inc., 518 U.S. 415, 427 (1996)), and the First Circuit has explained in similar circumstances that "[t]he rate of interest on an award is commonly treated as a matter of substantive law, and so as to a state claim, state law customarily governs in deciding whether interest is required or permitted and, if so, in what amount." Conetta v. Nat'l Hair Care Centers, Inc., 236 F.3d 67, 77-78 (1st Cir. 2001) (citing Freeman v. Package Mach. Co., 865 F.2d 1331, 1345 (1st Cir. 1988).

[6] Even applying a lower interest rate of 5%, the lowest rate that Massachusetts courts have upheld as a "fair rate," see Rivera, 993 N.E.2d at 1211 n.10, Urban's loss of use damages would be approximately $141,667. Zurich's offer would still be less than half that amount.

The Court acknowledges that reasonable differences in opinion might arise during settlement negotiations under Chapter 93A § 9(3), and that opposing parties will often begin with their most strategic bargain before meeting in the middle. However, the dispute at issue here is not attributable to the inherent imprecision and uncertainty involved in estimating damages nor good faith bargaining positions. Rather, it stems from Zurich's selection of assumptions that find little support in the record. As discussed above, Zurich's use of a hypothetical $500,000 settlement offer substantially undervalues Urban's claim, which was ultimately awarded nearly double that amount by a three-judge panel and is inconsistent with both the evidentiary record and Zurich's own internal assessments. Zurich's calculation is further based on its choice of October 2018 as the operative date, notwithstanding that its obligation to effectuate a prompt and fair settlement arose no later than June 2018, when discovery had closed and liability had become reasonably clear. Both assumptions serve to substantially reduce the amount offered to Urban, yet neither is adequately supported by the facts or relevant case law.

Moreover, in evaluating Zurich's proposed safe-harbor calculation, the Court cannot ignore the broader context of Zurich's claims handling. The record reflects years of inadequate investigation and settlement practices that failed to meaningfully engage with evidence demonstrating Weston's fault. See Hopkins, 750 N.E.2d at 952. Zurich also continued to rely on speculative assumptions regarding comparative negligence, including assumptions about how a jury might perceive Urban as a young male motorcyclist, despite the absence of credible, objective evidence supporting a substantial allocation of fault to Urban. The Court therefore does not view the parties' dispute as a good-faith disagreement over close questions of valuation or methodology. Rather, Zurich's proposed calculation lowballs both the amount that should have been offered and the period during which Urban was deprived of the use of those funds.

Permitting Zurich to obtain the protections of Section 9(3) on the basis of such unsupported assumptions would enable insurers to engage in years of unfair settlement conduct, only to erase the consequences by belatedly proposing a settlement figure that remains substantially below the claim's value.

In sum, Zurich's safe-harbor offer was not reasonable in relation to the loss-of-use injury that Urban actually suffered.

**SO ORDERED.**

Dated: November 25, 2026

/s/ Angel Kelley
Hon. Angel Kelley
United States District Judge